BY FAX 196

1 | DUGHI, HEWIT & DOMALEWSKI, P.C.
CHARLES M. RADLER, JR. (New Jersey SBN 036531983)
2 | (Pro Hac Vice Application Pending)
cradler@dughihewit.com
3 | 340 North Avenue
Cranford, New Jersey 07016
4 | Telephone: 908.272.0200
Facsimile: 908.272.0909
5 |
LOEB & LOEB LLP
6 | KARL E. BLOCK (SBN 112739)
kblock@loeb.com
7 | PATRICK DOWNES (SBN 186461)
pdownes@loeb.com
8 | 10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
9 | Telephone: 310.282.2000
Facsimile: 310.282.2200
10 |
Attorneys for Plaintiffs
11 | ZENSHIN, LLC and DAMIAN ROSS

```
FILED

MAY 11 2015

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:              Deputy Clerk
```

12 |              UNITED STATES BANKRUPTCY COURT

13 |              CENTRAL DISTRICT OF CALIFORNIA

14 |

15 | In re:                                    ) Case No.: 8:15-bk-10386-ES
                                              )
16 | HEATHER PIZZO, an individual,             )
                                              )
17 |          Debtor.                          ) Chapter 7
                                              ) Adv. No. _____
18 | _____     )
                                              )
19 | ZENSHIN, LLC and DAMIAN ROSS,            )
                                              )
20 |          Plaintiffs,                      ) **COMPLAINT (1) TO DETERMINE**
                                              ) **NON-DISCHARGEABILITY OF DEBT;**
21 |                                          ) **and (2) OBJECTING TO DISCHARGE**
     HEATHER PIZZO and                        )
22 | CHRISTOPHER PIZZO,                        )
                                              )
     Defendants.                              ) (Hearing to be set by Summons)
23 | _____     )

24 |

25 |          Secured Creditors, Zenshin, LLC ("Zenshin"), a New Jersey limited liability company and

26 | Damian Ross ("Ross"), residing at 59 East Allendale Road, Saddle River, New Jersey,

27 | (collectively the "Plaintiffs"), allege as follows for this Complaint: (1) for Non-Dischargeability

28 |

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001                        COMPLAINT

1  of Debt Pursuant to 11 U.S.C. § 523; and (2) Objecting to Discharge Pursuant to 11 U.S.C. § 727

2  (this "Complaint").

### I.

### PRELIMINARY STATEMENT

This adversary proceeding arises from conduct by wife and husband, Heather and

Christopher Pizzo (sometimes referred to herein as the "Pizzos"), in intentional derogation of the

publicity rights of Plaintiffs.  The unlawful and tortious conduct is described in detail below, and

consists of the intentional and wrongful misappropriation of Plaintiffs' names and likenesses in the

advertising, packaging and sale of martial arts instructional DVDs, an infringement on Plaintiffs'

right of publicity, fraud, and fraudulent transfers seeking to impair Plaintiffs' remedies.

In connection with a variety of schemes and fraudulent, willful and malicious conduct, the

Pizzos, through entities jointly controlled by them, exerted wrongful control over Plaintiffs'

property, publicity rights, name and likeness and siphoned off cash from company to company,

and often to the Pizzos themselves, as ultimate beneficiaries so as to render it extremely difficult

for Plaintiffs to enforce the judgment entered against the Pizzos in favor of Plaintiffs.

Significantly, Noble Learning Systems, Inc., jointly owned and operated by Debtor Heather Pizzo

and her husband Christopher, and Christopher Pizzo individually have already stipulated and

certified that certain conduct was intentional and fraudulent.

Plaintiffs are the holders of a consent judgment in the original amount of $1,165,000

against Debtor Heather Pizzo, her husband Christopher Pizzo, and all of their companies, which

arose as part of a settlement of Plaintiffs' claims for the intentional torts and myriad fraudulent

transfers summarized above.  For the reasons which follow, Plaintiffs ask the Court to declare that

the consent judgment's obligations are non-dischargeable in addition to other remedies sought.

Debtor Heather Pizzo is the sole debtor in this bankruptcy case.  By way of this adversary

proceeding, Plaintiffs seek determinations that: (a) the conduct complained of below gives rise to

claims which should be considered non-dischargeable in Mrs. Pizzo's bankruptcy case; (b) the

conduct complained of below warrants Mrs. Pizzo being denied a bankruptcy discharge in

accordance with 11 U.S.C. Section 727; (c) pursuant to 11 U.S.C. Section 524(a)(3), if the debts

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations
LA2426015.1
224594-10001
2
COMPLAINT

owed to Plaintiffs are declared non-dischargeable, they are non-dischargeable in Mrs. Pizzo's

bankruptcy case or would be declared non-dischargeable in Mr. Pizzo's hypothetical bankruptcy

case; (d) pursuant to 11 U.S.C. Sections 727 and 524(b), Mrs. Pizzo should be denied a discharge

in her bankruptcy case and Mr. Pizzo would be denied a discharge in his hypothetical bankruptcy

case; and (e) the relief afforded to Plaintiffs in this adversary proceeding would mean that the

marital community of Mrs. and Mr. Pizzo would not receive the benefits of a discharge granted to

Mrs. Pizzo, if any, in this bankruptcy case and the separate property of either or both of the Pizzos

would not receive the benefit of a bankruptcy discharge.

## II.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to hear this adversary proceeding as a core proceeding

under 28 United States Code Section 1334(a) and (b) and 28 United Sates Code Section

157(b)(2)(I) and (J).

2.      On or about January 27, 2015, Debtor Heather Pizzo filed a voluntary petition for

bankruptcy protection under chapter 7 of Title 11 of the United States Code, initiating the

bankruptcy case entitled In Re Heather Pizzo, Case No. 8:15-bk-10386-ES.

3.      This judicial district is the proper venue for this adversary proceeding under 28

United States Code Section 1409(a) as this adversary proceeding arises under, and is in connection

with, this bankruptcy case, which is currently pending before this Court in this judicial district.

4.      This adversary proceeding arises in Debtor Heather Pizzo's bankruptcy case, and

Plaintiffs bring this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001

and in accord with the provisions of part VII of the Federal Rule of Bankruptcy Procedure.

## III.

## IDENTIFICATION OF THE PARTIES AND CERTAIN RELATED ENTITIES

**A.     Plaintiffs.**

5.      Plaintiff Ross is a renowned martial artist and martial arts instructor.  Plaintiff

Zenshin is a New Jersey limited liability company owned by Ross.  Plaintiffs are in the business of

providing martial arts instruction, including but not limited to producing and distributing videos,

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

3

COMPLAINT

1  DVDs, on-line access to their content, and written materials relating to close combat training and

2  the martial arts.  Plaintiffs are secured creditors of Debtor Heather Pizzo, her husband Christopher,

3  and all known entities which they own and control.

4  **B.    Defendants.**

5          6.      Debtor Heather Pizzo is an individual with her residence in Orange County,

6  California.  On information and belief, Debtor Heather Pizzo holds herself out to the public with

7  the title of Doctor.  Debtor Heather Pizzo's Schedule I identifies her as a school psychologist at

8  the Buena Park, California school district and an adjunct Professor at Grand Canyon University.

9          7.      Christopher Pizzo is the husband of Debtor Heather Pizzo and resides with her in

10  Orange County, California.

11  **C.    Entities Related to, Owned by and Controlled by Debtor Heather Pizzo and Her**

12        **Husband Christopher.**

13         8.      Noble Learning Systems, Inc. ("Noble") was at all times relevant hereto a

14  New Jersey corporation owned 50% by Debtor Heather Pizzo and 50% by Christopher Pizzo.

15  Christopher Pizzo was the President and Debtor Heather Pizzo was the Treasurer of Noble.

16  Copies of New Jersey State Business Gateway Service Business Entity Status Reports and related

17  documents for 2007, 2011 and 2015 demonstrating that Debtor Heather Pizzo was the Treasurer of

18  Noble throughout that period of time are attached as Exhibit 1.

19         9.      Debtor Heather Pizzo entered into a written Employment Agreement with Noble

20  which designated her as its "Financial Officer" (the "Employment Agreement").  The

21  Employment Agreement and Plaintiffs' transcription of that document are attached as Exhibit 2.

22  Pursuant to the Employment Agreement, Debtor Heather Pizzo agreed to "perform faithfully,

23  industriously, and to the best of Debtor Heather Pizzo's ability, experience and talents" and to

24  serve "as a member of executive leadership team," including participating in, "key decisions

25  regarding... strategic initiatives, operating model and operational execution."  Mrs. Pizzo  was

26  responsible for "complete analysis of financial results."  She was also charged with "opening new

27  operations, asset acquisition, [and] new service launches."  Pursuant to the  Employment

28  Agreement, as Noble's Financial Officer, Mrs. Pizzo was  in charge of "corporate document

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

4
COMPLAINT

1  management." These are the responsibilities which Mrs. Pizzo assumed in a document which she

2  and her husband crafted long before any disputes arose between the parties to this action, and the

3  Employment Agreement fairly sets forth the scope of her responsibilities. According to a

4  Certification filed by her husband, Christopher Pizzo, dated January 23, 2013, "Heather Pizzo

5  rendered those services to Noble without a new contract until Gary Reinert joined as part-time

6  CFO in 2007," justifying Noble's compensation to Debtor Heather Pizzo in 2007.

7       10.    Pizzo Wealth, LLC ("Pizzo Wealth") is a New Jersey limited liability company

8  formed, co-owned and managed by the Debtor Heather Pizzo and her husband Christopher. Pizzo

9  Wealth received fraudulent transfers from Noble.

10       11.    Noble Wealth Systems, LLC ("Noble Wealth") is a Nevada limited liability

11  company formed, co-owned and managed by Debtor Heather Pizzo and her husband Christopher.

12  Noble Wealth received fraudulent transfers from Noble and Close Combat Company, LLC.

13       12.    CHP Family Investment, LLC ("CHP") is a Delaware limited liability company

14  formed, co-owned and managed by Debtor Heather Pizzo and her husband Christopher. C is the

15  initial of Christopher's first name; H is the initial of Heather's first name; and P is the initial of the

16  Pizzos' last name. CHP sold access to certain content and intellectual property despite a

17  restraining order entered in a New Jersey Superior Court that prohibited the transfer of the right to

18  sell any such assets from Close Combat Company, LLC, resulting in a Restraining Order against

19  CHP.

20       13.    Close Combat Company, LLC ("Close Combat") is a New Jersey limited liability

21  company which Debtor Heather Pizzo's husband Christopher has testified was an alter ego of

22  Noble.

23  **IV.**

24  **FACTS COMMON TO VARIOUS CLAIMS FOR RELIEF**

25  **A.    Debtor Heather Pizzo and her husband Christopher Perpetrate the Intentional**

26  **Misappropriation of Plaintiffs' Name and Likeness Through Noble.**

27       14.    In connection with her role as the Financial Officer of Noble, Debtor Heather Pizzo

28  signed important agreements on behalf of the Noble, including a Marketing Agreement which was

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

5
COMPLAINT

1    used to justify hundreds of thousands of dollars of payments to Noble Wealth. A copy of the

2    Marketing Agreement is attached as Exhibit 3.

3            15.    In connection with Debtor Heather Pizzo's role as the financial officer of Noble,

4    which received virtually all of its revenues from internet sales through credit cards, Debtor

5    Heather Pizzo was directly involved in transactions with banks on important issues, including

6    excessive charge-backs, monthly fines of $6,816, $8,745 and $9,818, and the termination of

7    Noble's merchant account for such serious transgressions. Letters addressed to Debtor Heather

8    Pizzo from February 13, 2007 through January 31, 2008 documenting her active role as the

9    Financial Officer of Noble in 2007 and early 2008 are attached as Exhibit 4.

10           16.    On or about December 8, 2005, Zenshin and Noble entered into a distribution

11   agreement (the "Distribution Agreement") which permitted Noble to be the exclusive distributor

12   of certain martial arts instructional DVDs that were produced and prepared by Plaintiffs and which

13   contained Plaintiffs' name and likeness in the DVDs, on the packaging of the DVDs, and in all of

14   the advertisements for the DVDs. The Distribution Agreement is attached as Exhibit 5.

15           17.    By its terms, the Distribution Agreement terminated one year after its effective

16   date. However, Zenshin and Noble agreed to informally extend the Distribution Agreement for a

17   number of months thereafter while they attempted to negotiate new terms for the distribution of

18   martial arts instructional DVDs containing the names and likenesses of Plaintiffs.

19   **B.    The Termination of the Distribution Agreement Between Plaintiffs and Noble and the**

20   **Intentionally Wrongful Sale of Plaintiffs' Products by Debtor Heather Pizzo and Her**

21   **Husband Christopher Through Noble.**

22           18.    Because Zenshin and Noble could not successfully reach an agreement on the

23   extension of the Distribution Agreement, Plaintiffs terminated the Distribution Agreement on or

24   about October 22, 2007 by way of a termination letter to Noble (the "October 22 Termination

25   Letter"). The October 22 Termination Letter confirmed that the Distribution Agreement and all

26   other business between Plaintiffs Noble, Christopher Pizzo and others would be terminated as of

27   October 31, 2007. The October 22 Termination Letter further advised that any use or later sale of

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

6
COMPLAINT

1   any videos, DVDs, written materials, advertisements, content or the use of Ross' name and

2   likeness after October 31, 2007 would be unlawful and an infringement of Plaintiffs' rights.

3        19.    Despite termination of the Distribution Agreement and all of Noble's rights to use

4   Plaintiffs' name and likeness in the products that it sold, and in the packaging and advertising used

5   to market those products, Noble continued to market and sell such products, and to use Plaintiffs'

6   name, likeness and reputation to do so after October 31, 2007.

7        20.    On or about November 7, 2007, Plaintiffs' counsel sent another letter to Noble,

8   Christopher Pizzo and others (the "November 7 Letter").

9        21.    The November 7 Letter confirmed that Noble was still selling products that

10  contained Plaintiffs' name and likeness and that Noble was using Plaintiffs' name, likeness and

11  reputation on websites and in print advertisements to market and sell those martial arts

12  instructional DVDs.  It also attached dated screen shots of websites proving those claims.

13       22.    In response to the November 7 Letter, on November 13, 2007, counsel for Noble,

14  Christopher Pizzo and others, sent a letter to Plaintiffs' counsel denying the sale of any products

15  containing Plaintiffs' name and likeness after October 31, 2007, and representing that, with the

16  exception of one videotape and two DVDs, all products containing Plaintiffs' name and likeness

17  had been returned to Plaintiffs (the "November 13 Letter").

18       23.    The November 13 Letter further confirmed that there was no dispute that the

19  Distribution Agreement between Zenshin and Noble and all business relationships between the

20  parties were terminated effective October 31, 2007.  Most significantly, Noble and Christopher

21  Pizzo represented through counsel that all product sales were terminated as of October 31, 2007,

22  as follows:

23                 I am in receipt of your correspondence dated November 7, 2007
with regard to the outstanding issues at this time between our

24  respective clients.  My client [defined earlier in the letter as
Christopher Pizzo, Noble Learning (sic) LLC, and Noble Wealth,

25  LLC] has confirmed that all business affiliations with your client
were terminated effective as of October 31, 2007.  All sales of any

26  products under the license agreement between our respective clients
were terminated as of that date.  My client has confirmed that no

27  sales were made of any products covered by the license agreement
after October 31, 2007.

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

7

COMPLAINT

24.     Contrary to the representations made in the November 13 Letter, Noble continued to use Ross' name, likeness and reputation to market products on its websites and in various industry magazines after October 31, 2007, through at least February 2008.

25.     In addition to Noble's wrongful sales of products advertised with and containing the names and likenesses of Plaintiffs, Close Combat, a company that was admitted by the Pizzos to be a "rebranded" version of Noble, used Noble's customer list to send an e-mail dated February 5, 2008 to all of the customers who had previously purchased products containing Plaintiffs' names and likenesses offering to sell those products for $39, even though those products had previously sold for $97 per disk (the "Close Combat E-mail").

26.     The Close Combat E-mail permanently damaged the value of Plaintiffs' name, reputation and brand with every customer ever known to have purchased similar products from Plaintiffs.

**C.     Debtor Heather Pizzo and her husband Christopher, Who Co-Owned and Controlled Noble, and who were both officers of Noble, Used Hundreds of Thousands of Dollars of the Proceeds of Wrongful Sales of Products Containing Plaintiffs' Name and Likeness to "Rebrand" Noble into Close Combat and to Launch Close Combat.**

27.     In September 2007 Noble hired Ries & Ries, a public relations firm, to suggest a new strategy for marketing Noble's martial arts DVDs.  That strategy was set forth in detail in a report dated September 20, 2007 (the "Rebranding Report").

28.     Debtor Heather Pizzo and her husband Christopher promptly embarked on the exact strategy suggested in the Rebranding Report, including changing the name of the company (Noble) to Close Combat, and changing the primary website from TopSecretTraining.com to CloseCombatTraining.com.  Noble also paid for four-page spreads in Black Belt Magazine that make no reference to Noble, and which explicitly and repeatedly reference Close Combat.  Those four-page spreads in Black Belt Magazine ran for a year and cost almost $5,000 per month.  Those Black Belt Magazine ads drove traffic to the CloseCombatTraining.com and the CloseCombatCompany.com websites.  Christopher Pizzo has testified under oath to these facts.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

8

COMPLAINT

29.    Christopher Pizzo testified under oath that Close Combat received and used Noble's customer list, without paying anything for that valuable asset.

30.    Noble hired Rosica, another public relations firm, which arranged for Christopher Pizzo to appear on the Today Show. Christopher Pizzo testified that while appearing on the Today Show, Mr. Pizzo drove traffic to Close Combat and the same websites that were mentioned in the Black Belt Magazine ads. Christopher Pizzo has admitted under oath that "all that work to launch Close Combat got paid for by Noble." Before Close Combat even had a bank account, Noble paid for Google ads that Christopher Pizzo has admitted in testimony under oath were "driving traffic to the Close Combat site." He further admitted in testimony under oath that it was "Noble's American Express card bill paying for all that traffic to be driven to Close Combat."

31.    An E-mail dated February 22, 2008 (the "February 22, 2008 E-mail") documents that everything contained in the Rebranding Report had already happened by February 22, 2008. The company name had been changed to "Close Combat," and Christopher Pizzo's stage name of "Lieutenant X" at Noble had now been changed to "Captain Chris" at Close Combat. The positioning statement "World Leader in Self-Defense" was also reflected in the e-mail. In addition, the websites had been changed. Christopher Pizzo admitted under oath "that the rebranding effort was complete" by the February 22, 2008 e-mail.

32.    Christopher Pizzo admitted under oath that in March and April of 2008, Noble was paying, on its American Express card, for the Black Belt Magazine and Google internet ads driving traffic to the Close Combat website. Christopher Pizzo has also admitted under oath that "Close Combat and Captain Chris launched as another brand of Noble on Thanksgiving of 2007."

33.    From November 2007 through April 2008, Close Combat conducted sales on the CloseCombatCompany.com and CloseCombatTraining.com websites, despite the fact that it did not have a bank account. Close Combat used Noble's bank account for those sales, and during that period of time, Noble paid all expenses associated with generating those sales.

34.    When Noble had dissipated the proceeds from the wrongful sale of Plaintiffs' products, in an amount in excess of $1,146,000, it had many vendors that had not yet been paid, including over $50,000 in consulting fees owed by Noble to Close Combat member Gary Reinert

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

9

COMPLAINT

("Reinert"). After Noble ran out of cash, Reinert prepared a 2008 year-end owners compensation report that specifically budgeted Close Combat's payment of consulting fees owed by Noble to him in the months of May through August 2008 (the "Owners' Compensation Report"). That Owners' Compensation Report was delivered to Christopher Pizzo.

35.    After Noble ran out of money, Close Combat paid many of Noble's expenses, including consulting fees to Reinert.

36.    After the end of the 2008 business year, Noble and Close Combat prepared numerous sets of adjusting journal entries that documented that Noble and Close Combat had comingled hundreds of thousands of dollars of assets and that each company had paid nearly a hundred thousand dollars of expenses for the other (the "Adjusting Journal Entries").

37.    All of expenses incurred by Close Combat were authorized by and often paid for by Noble to or for Close Combat's benefit through Noble's co-owner and Treasurer, Debtor Heather Pizzo.

**D.    Plaintiffs are Awarded Over $2,850,000 on Their Intentional Tort Claims Against Noble, Close Combat and Christopher Pizzo.**

38.    Plaintiffs initiated litigation against Close Combat, Noble and Christopher Pizzo (sometimes referred to herein as the "Infringers") in the Superior Court of New Jersey, Chancery Division, Bergen County, Docket Number C-77-08 (the "Chancery Action") by Order to Show Cause ("OTSC") and Verified Complaint. Notwithstanding the November 13 Letter authored by their own counsel, which confirmed that the Infringers could not and would not sell Plaintiffs' products after the Distribution Agreement was terminated, the Infringers argued at the return date of the OTSC that an unsigned version of a new agreement they had prepared constituted an "executory contract" that permitted them to make the unauthorized sales of DVDs containing Plaintiffs' names and likenesses and to continue using Plaintiffs' names and likenesses in the advertisements for those sales after October 31, 2007.

39.    At the return date of the OTSC, The Honorable Peter E. Doyne, ruled that, "It's fairly clear to me that this idea of executory contracts have (sic) been conjured up subsequent to the filing of the complaint." An excerpt of that transcript is attached as Exhibit 6.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

10
COMPLAINT

40.    Judge Doyne entered a restraining order dated March 14, 2008 (the "Original TRO") impounding the remaining inventory of DVDs containing Plaintiffs' names and likenesses and ordering the following accounting:

> Close Combat, Noble and Pizzo, shall provide a full and complete accounting relating to the sale, distribution or transfer of any Zenshin Media between January 1, 2007 and the date of this Order. The accounting shall provide an itemization of all units produced, all units sold, all proceeds received from the sale of the units, and the disposition of such proceeds, broken down on a monthly and cumulative basis….

A copy of the Original TRO is attached as Exhibit 7.  Order paragraph 5.

41.    In response to the Original TRO, Christopher Pizzo, Noble and Close Combat produced an accounting (the "Accounting").  A copy of the Accounting is attached as Exhibit 8. Debtor Heather Pizzo was the Treasurer of Noble and a 50% owner of Noble throughout this process.  The Accounting of Noble's wrongful sales of Plaintiffs' products admitted $1,146,533.21 in wrongful sales of "Distribution Agreement Products only," but it claimed $424,066.78 in product returns, $40,407.25 in cost of goods sold, $81,101.66 in shipping, $592,256.14 in operating expenses and $170,133.55 in royalties.  Exhibit 8 (Ross-000383).  Based on those expenses, defendants claimed to have actually lost approximately $161,000 on the wrongful sales.  Id. (Ross-000384).

42.    The Accounting claims $424,065.78 in "returns and processing fees" from September 1, 2007 through February 28, 2008.  That number was fabricated.  Noble's tax returns for the same periods show absolutely no product returns whatsoever in the dedicated line on the tax returns for "returns" from gross sales.  Line 1(a) of the Form 1120S for Noble for 2007 states that "gross receipts or sales" are $3,592,868.  Line 1(b) states "less returns and allowances."  That box is empty.  Line 1(c) lists total sales of $3,592,868, proving conclusively that Noble represented to the Internal Revenue Service that it had no returns or allowances.  The same is true in both the year before and the year after.  Similarly, the itemization of expenses on the tax returns contain no entry whatsoever for processing fees in either of those two years.  The tax returns reflect deductions on lines 7-18, none of which make any reference to processing fees, and $2,138,406 in "other deductions" which are contained on Statement 3 on page 1 of the "Federal

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

11
COMPLAINT

Statements" attached to the tax returns. There is nothing in the Federal Statements which makes any reference to anything like processing fees.

43.    After Judge Doyne ruled that the Infringers' only defense for the wrongful sales of DVDs containing Plaintiffs' names and likenesses was "conjured up," the Infringers moved for and obtained an Order compelling arbitration pursuant to an arbitration clause in the Distribution Agreement.

44.    Plaintiffs initially filed a Demand for Arbitration before the American Arbitration Association (the "AAA Arbitration"), but the parties agreed to discontinue the AAA Arbitration and to have The Honorable C. Judson Hamlin, (Ret.) ("Judge Hamlin") act as Discovery Master and Binding Arbitrator. All of the claims alleged by Plaintiffs against the Infringers were ultimately adjudicated by Judge Hamlin as Discovery Master and Binding Arbitrator.

45.    Plaintiffs propounded a Notice to Produce Documents on the Infringers that required production of all original records relating to over $424,000 in product returns and over $883,000 in expenses claimed in the Accounting. The Infringers produced general ledgers, but they failed to produce any product return records and any invoices, contracts or other records of their purported expenses. Debtor Heather Pizzo was the Treasurer of Noble and a 50% owner of Noble throughout this process. According to her Employment Agreement with Noble, which her husband certified remained in effect through late 2007, Debtor Heather Pizzo was also in charge of "corporate document management" for Noble at that time. When the Infringers failed to produce a single invoice or contract to support over $883,000 in expenses, Plaintiffs filed a discovery motion. On June 3, 2010, after a series of discovery motions and orders, Judge Hamlin ordered the Infringers to produce "2(b) all documents reflecting all of Respondents' [Infringers] business expenses from 2006 through 2008; and 2(c) all documents reflecting all of Respondents' [Infringers] business expenses which correlate to the expense categories claimed in the prior Accounting, including all documents reflecting returns of merchandise." Judge Hamlin further ruled, "Any documents or items required to be produced pursuant to paragraph number 2 hereof and not produced by June 7, 2010, with time of the essence, will be deemed to be non-existent,

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

12
COMPLAINT

and the Respondents [Infringers] are hereby barred from the subsequent production of, and any reliance upon, the same...." A copy of the June 3, 2010 Discovery Order is attached as Exhibit 9.

46.    By letter dated June 7, 2010, the Infringers' counsel acknowledged that the Infringers had no original business records to support the product returns or any of the expense line items in the Accounting. A copy of that correspondence is attached as Exhibit 10. As of June 7, 2010, all parties to the arbitration and Debtor Heather Pizzo, as Treasurer and a 50% owner of Noble, knew that the Infringers had admitted over $1,146,000 in wrongful sales of products containing Plaintiffs' names and likenesses in the Accounting, that the Infringers had the burden of proof to establish all of the product returns and expenses they claimed as deductions from those revenues, and that they were barred from relying on any business records to establish expenses or deductions from those revenues. In fact, per Judge Hamlin's Order, all such documents were "deemed not to exist." Despite knowing that the Accounting of the Infringers' wrongful sales pursuant to the Original TRO was a fraud and that there were absolutely no business records to prove approximately $1,300,000 in fabricated returns and expenses, Debtor Heather Pizzo and her husband Christopher Pizzo continued to loot Close Combat's bank account down to approximately $500 each month. Through transfers to their company Noble Wealth, in which Debtor Heather Pizzo was also an officer and a 50% owner, the Pizzos received approximately $1,200,000 in payments from Close Combat in 2010. They took these funds despite the pending arbitration with Close Combat, their knowledge that they had no right to use Plaintiffs' intellectual property, their knowledge that the Accounting admitted liability and that the June 3, 2010 Discovery Order had made the case completely indefensible on damages. Christopher Pizzo did not take his share of Close Combat's "profits" as salary or compensation. Debtor Heather Pizzo and her husband Christopher instead paid "management fees" for their alleged services to Noble Wealth, a limited liability company which the Pizzos formed in Nevada, a state where they never resided. Accordingly, while Debtor Heather Pizzo did not own any interest of record in Close Combat, she received half of her husband's distributions from Close Comfort, because they were paid to Noble Wealth, which she co-founded, co-owned and co-managed.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

13
COMPLAINT

47.    Despite Judge Hamlin's Order compelling Noble and Close Combat to produce, "all documents reflecting all of Respondents' [the Infringers'] business expenses from 2006 through 2008," Noble, Close Combat and Debtor Heather Pizzo, the Treasurer of Noble, withheld all of the Adjusting Journal Entries, the Owners Compensation Report, and all of the monthly accountings which distributed 70% of the cash-based "profits" of Close Combat to Noble Wealth, with no reserve or allowance for Plaintiffs' imminent and substantial recovery.  The refusal to produce those records was knowing and willful, and it exacerbated the damages aspect of a case where the Infringers' own Accounting admitted liability.  Despite actual knowledge of the clear case of liability against the Infringers, Debtor Heather Pizzo and her husband Christopher Pizzo's active role in attempting to cover it up by withholding documents, and the certain consequences of the June 4, 2010 Order, Debtor Heather Pizzo and her husband Christopher Pizzo siphoned those funds into Noble Wealth and continued to take distributions from Close Combat which were many times the value of any services they rendered.

48.    On April 18, 2012, Arbitrator Hamlin issued his Final Arbitration Award (the "Arbitration Award").  A copy of the Arbitration Award is attached as Exhibit 11.  The Arbitration Award concluded that the Accounting was fraudulent, Exhibit 11, Page 8 (documents to corroborate Accounting were not produced); Page 9 (determining that revenues were understated and expenses were significantly inflated).  Arbitrator Hamlin entered an award that disgorged all of Noble's ill-gotten profits from the wrongful sale of products using Plaintiffs' name and likeness; he awarded an additional $900,000 for harm to Plaintiffs' brand from the Infringers' $39 discount pricing, and he awarded $350,000 in punitive damages, expressly ruling that the intentional nature of the Infringers' conduct, compounded by intentional abuses of the arbitration process warranted that extraordinary relief.  On May 16, 2012, after correcting a calculation error, Arbitrator Hamlin issued an Order for Final Judgment in the arbitration in the amount of $2,438,046.16 plus interest and costs.  A copy of that Order for Final Judgment is attached as Exhibit 12.

49.    Plaintiffs filed a motion in the Chancery Action for an order confirming the Arbitration Award and entering judgment, and the Infringers filed a cross-motion to vacate the

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

14
COMPLAINT

1   Arbitration Award. By Order dated July 31, 2012, The Honorable Robert P. Contillo, the

2   Presiding Judge of the Chancery Division, entered an Order confirming every aspect of the

3   Arbitration Award and entering judgment (the "Final Judgment"). Copies of the Final Judgment

4   and Judge Contillo's Opinion are attached as Exhibit 13.

5        50.    Despite the entry of the Final Judgment, Christopher Pizzo and Debtor Heather

6   Pizzo continued to loot Close Combat to an ending balance of approximately $500 each and every

7   month, taking whatever funds they could from Close Combat, siphoning those funds into their

8   Nevada company, Noble Wealth, without regard for the value of their services and with no reserve

9   for the payment of Close Combat's debt to Plaintiffs.

10       51.    Debtor Heather Pizzo ran the Pizzo family's household budget, including many of

11  her personal expenses, on credit cards paid by Close Combat and Noble Wealth and out of Noble

12  Wealth's checkbook. Noble Wealth was originally registered to do business in New Jersey. On

13  September 13, 2012, shortly after the entry of the Final Judgment, and after the Pizzos sold their

14  home in New Jersey for over $1,500,000, fled the jurisdiction, and relocated to a rented home at

15  11 Midnight Sun, Irvine, California, Debtor Heather Pizzo and her husband Christopher Pizzo

16  registered Noble Wealth to do business in the State of California. On information and belief, the

17  Pizzos did so to permit them to open a California bank account for Noble Wealth.

18       52.    Christopher and Debtor Heather Pizzo paid for their personal expenses in

19  California from Noble Wealth's account, while judgment debtor Christopher Pizzo continued to

20  earn handsome compensation from Close Combat, without taking any of that compensation in his

21  own name. Documents from the Secretary of State of the State of Nevada containing the Articles

22  of Organization for Noble Wealth and its annual reports for the years 2005 through 2011, together

23  with documents from New Jersey and California reflecting Noble Wealth's status in those states

24  are attached as Exhibit 14. Those documents, authorized by the Pizzos, conclusively establish that

25  Debtor Heather Pizzo co-founded and co-managed Noble Wealth. The registered agent for Noble

26  Wealth was Sage International. That company maintains a website at http://sageintl.com which

27  describes its principal, Cheri S. Hill, as a "wealth protection diva." Those documents are also

28  enclosed in Exhibit 14.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

53.    On information and belief, despite Christopher Pizzo's Certifications to the contrary, for the period of time from November 1, 2007 through its final closure, Noble Wealth operated primarily for the purpose of receiving fraudulent transfers from Noble and Close Combat to subsidize the lifestyles of Debtor Heather Pizzo and her husband Christopher.

54.    The Infringers filed an appeal, which was litigated to conclusion. The Appellate Division ultimately rejected all of the Infringers' arguments, finding they were so meritless as to not warrant an opinion in detail. A copy of the Order dismissing the Infringers' appeal is attached as Exhibit 15.

**E.     Debtor Heather Pizzo and Her Husband Christopher Perpetrate Myriad Fraudulent Transfers, Including Direct Transfers of the Proceeds of Their Intentional Torts, Into a CondominiumThey Purchased and Into Shell Companies Jointly Owned and Operated by Debtor Heather Pizzo and Her Husband Christopher.**

**1.     Fraudulent Transfers to Pizzo Wealth.**

55.    Seven days after Plaintiffs' counsel wrote a "cease and desist" letter regarding the infringements which were the central focus of the action for misappropriation of name and likeness, Noble made the first of two monetary transfers totaling $350,000 designated as "royalties" to Pizzo Wealth, which entity was owned, controlled and managed by Debtor Heather Pizzo and her husband Christopher. In fact, those transfers were fraudulent conveyances to insiders for no consideration.

56.    The Infringers' own business records confirm that, on October 9, 2007, Noble transferred $50,000 to Pizzo Wealth and on October 29, 2007, Noble transferred an additional $300,000 to Pizzo Wealth. Noble's 2008 Profit and Loss Statement and Transaction Detail by Account report reflecting both transfers is attached as Exhibit 16.

57.    In his April 18, 2012 Arbitration Ruling and Award Decision, Judge Hamlin found that the $350,000 in transfers were not disclosed in the Accounting defendants produced in response to Judge Doyne's April 14, 2008 Order. Judge Hamlin ruled as follows (emphasis added):

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

16

COMPLAINT

> In considering defendants intent and conduct claimant raises a troublesome issue that's unrebutted here. At the same time that respondent was claiming extraordinary expenses allocated to this contract the Pizzo entities apparently transferred $350,000 described as royalties to an unrelated entity identified as Pizzo Wealth LLC owned by Chris Pizzo and his wife. It would appear that $300,000 of that sum was transferred on [October] 29, 2007, and although reported in Quick Books and tax returns, was noticeably absent from the accounting produced pursuant to Judge Doyne's order. **The clear inference for this proceeding is that such action is unmistakable evidence of a continuing intentional and purposeful act to profit at claimant's cost.**

Exhibit 11 (Page 10). (Emphasis added.)

58.    Although Debtor Heather Pizzo and her husband Christopher Pizzo were the founders and owners of Pizzo Wealth, and despite huge payments from Noble which were allegedly royalties to Pizzo Wealth, their federal income tax returns for the years 2006 through 2008 fail to reflect any income generated from or losses sustained by Pizzo Wealth. The Pizzos' Federal Income Tax Returns for the years 2006 through 2008, while identifying other business entities they own, conspicuously omit Pizzo Wealth. Those transfers, disguised as "royalties," were intended to defraud Plaintiffs, exactly as the Arbitrator and Courts referenced herein held.

59.    After using Pizzo Wealth as the recipient of at least $350,000 in fraudulent transfers in October 2007, Pizzo Wealth filed its last annual report for the company on November 13, 2007, and thereafter allowed the company's charter to be revoked for not filing future annual reports. Pizzo Wealth remains in revoked status. The funds fraudulently transferred into Pizzo Wealth were used to subsidize the lifestyles of Debtor Heather Pizzo and her husband Christopher.

**2.    Fraudulent Transfers to Noble Wealth.**

60.    On December 30, 2006, Noble transferred $150,000 designated as "marketing" to Noble Wealth, which entity is owned, controlled and managed by Debtor Heather Pizzo and her husband Christopher. This transfer was made when the one-year term of the Distribution Agreement had expired and when Debtor Heather Pizzo and her husband Christopher knew they could no longer distribute Plaintiffs' merchandise and make use of Damian Ross' name and likeness absent a new agreement as between the parties.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

17

COMPLAINT

61.    Although Christopher Pizzo and Debtor Heather Pizzo are the sole members and managers of Noble Wealth, according to annual reports filed with the State of Nevada each year from 2006 through 2011, their Federal Income Tax Returns for the years 2006 through 2008 fail to reflect any income generated from or losses sustained by Noble Wealth.  Their Federal Income Tax Returns for the years 2006 through 2008, while identifying other business entities they own, conspicuously omit mention of Noble Wealth.  Once again, Debtor Heather Pizzo and her husband Christopher Pizzo fraudulently transferred funds from one of their operating companies to one of their "wealth" companies, without paying taxes owed by the transferee company, and simultaneously defrauding Plaintiffs.  These funds, and all other funds fraudulently transferred into Noble Wealth, were used to subsidize the lifestyles of Debtor Heather Pizzo and her husband Christopher.

**3.    Fraudulent Transfers directly to Debtor Heather Pizzo and her husband Christopher.**

62.    In the calendar year ending December 31, 2007, Noble made distributions of $48,000 to Christopher Pizzo and $24,000 to Debtor Heather Pizzo.  In addition to officer compensation, the 2007 Noble Schedule K-1 Forms reflect that both Debtor Heather Pizzo and her husband Christopher each declared $75,670 as their individual share of Noble's current year income.

63.    The distributions to Debtor Heather Pizzo and her husband Christopher (the " "Distributions") were made (a) at the same time that Debtor Heather Pizzo and her husband Christopher were selling Plaintiffs' merchandise and misappropriating Ross' name and likeness without their knowledge, consent and authorization, in violation of the Distribution Agreement and contrary to the defendants' representations that they were not doing so; (b) subsequent  to the termination of the Distribution Agreement; and (c)  subsequent to the time Plaintiffs notified the Infringers in writing that the Distribution Agreement and all other business affiliations involving Plaintiffs and the defendants would terminate as of October 31, 2007.  The distributions were direct transfers of the proceeds of the Pizzos' intentional torts to Debtor Heather Pizzo.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

18
COMPLAINT

64.    Noble and Close Combat were insolvent from and after the date of the Infringers' wrongdoing.

65.    On information and belief, each transfer of funds from Noble and Close Combat to any of Noble Wealth, Pizzo Wealth, CHP, Christopher Pizzo or Debtor Heather Pizzo, as identified in this Complaint, were made with the intent to hinder, delay and defraud Plaintiffs. CHP and Noble Wealth admitted that the transfers to them were made with the intent to hinder, delay and defraud creditors.

66.    In the calendar year ending December 31, 2008, amid the ongoing litigation and arbitration, and notwithstanding the unfavorable preliminary injunctive relief order already entered against the Infringers, the Pizzos' 2008 federal personal tax returns reflect $9,471 in income for Debtor Heather Pizzo from Noble, $9,471 in income for Christopher Pizzo from Noble, and $67,622 in income for Christopher Pizzo from Close Combat, for total transfers from Noble to the Debtor Heather Pizzo and her husband Christopher in the amount of $86,564.  On information and belief, Debtor Heather Pizzo and her husband Christopher received additional fraudulent transfers from their operating entities.

4.    **Debtor Heather Pizzo and Her Husband Christopher Pizzo Purchased a Luxury New Jersey Vacation Condominium Using Fraudulently Transferred Funds from Noble to Pay the Down Payment.**

67.    On August 4, 2007, after the expiration of the Distribution Agreement and as negotiations between Plaintiffs and Noble were reaching an impasse, Noble transferred $114,750 to the Title Company of New Jersey, representing the initial deposit on a luxury New Jersey shore vacation condominium.

68.    On February 23, 2008, after the Infringers had represented to Plaintiffs that they were not using Plaintiffs' name and likeness, at the very end of Noble's wrongful sale of over $1,140,000 of products containing Plaintiffs' names and likenesses, Noble transferred an additional $119,750 to the Title Company of New Jersey, representing the second down payment for that condominium.  These transfers were designated in Noble's business records as "cash" and

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

19
COMPLAINT

1    "building," at a time that Debtor Heather Pizzo was a 50% owner and the Treasurer of Noble.

2    Copies of Noble's ledgers to that effect are attached as Exhibit 17.

3         69.    The original contract to purchase the condominium was entered into by Noble.

4    That contract anticipated a closing date in November 2008.  On January 6, 2009, Noble signed an

5    Assignment of its contract rights, transferring the right to buy the condominium to

6    Christopher Pizzo and Debtor Heather Pizzo (the "Assignment").  On June 5, 2009, Debtor

7    Heather Pizzo and her husband Christopher signed an Addendum to their Purchase and Sale

8    Agreement (the "Addendum") changing the unit of the condominium and agreeing to close on

9    Unit Number 1103 at a price of $890,000, rather than the original Unit 1208.  The condominium

10   that Debtor Heather Pizzo and her husband Christopher purchased with monies fraudulently

11   transferred from Noble was a tenth floor luxury unit referred to as the "Lighthouse," with almost

12   2,400 square feet total, including an octagonal veranda.  Copies of the floor plan for the

13   Condominium, the Assignment, the Addendum and a more legible but unsigned copy of the

14   Addendum are attached as Exhibit 18.

15        70.    On August 11, 2009, Debtor Heather Pizzo and her husband Christopher  Pizzo

16   obtained a First Mortgage Commitment Letter from Hudson City Savings Bank for the purchase

17   of the condominium.

18        71.    On August 21, 2009, Debtor Heather Pizzo and her husband Christopher Pizzo

19   closed on the purchase of Unit 1003 of "The Grand at Diamond Beach" (the "Condominium") for

20   the purchase price of $890,000.  A copy of the Deed to Christopher and Debtor Heather Pizzo is

21   attached as Exhibit 19.  Debtor Heather Pizzo instituted and controlled this transaction.  She knew

22   at that time that she bought the Condominium in her own name that the $234,500 down payment

23   for the purchase of the Condominium had not been paid from her own funds, but in actuality had

24   been paid from a fraudulent transfer of funds from Noble, which were the direct proceeds of the

25   wrongful and intentional misappropriation of Plaintiffs' name and likeness.  These events all

26   occurred at a time when Debtor Heather Pizzo was a 50% owner and Treasurer of Noble.

27        72.    In connection with Debtor Heather Pizzo's diversion of the proceeds of the

28   intentional torts she perpetrated on Plaintiffs to pay the down payment on the Condominium,

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

20

COMPLAINT

1   Debtor Heather Pizzo and her husband Christopher Pizzo signed a Promissory Note and Mortgage

2   on August 21, 2009 in the sum of $623,000, to complete funding for the acquisition of their

3   condominium.

4         73.     When the Infringers could not post a supersedeas bond, Plaintiffs commenced

5   levying on their assets and filed another action in the Superior Court of New Jersey, Chancery

6   Division, Bergen County (the "Fraudulent Transfer Action") against Close Combat, Noble,

7   Christopher Pizzo, Debtor Heather Pizzo, Noble Wealth, Pizzo Wealth, CHP and others.

8         74.     Christopher Pizzo and Debtor Heather Pizzo used the credit cards of and accounts

9   at Pizzo Wealth, Noble Wealth and CHP, all of which were jointly owned, jointly controlled and

10  jointly operated to pay many of their ordinary and customary family and household expenses.

11  During the entire period relevant to these allegations, Debtor Heather Pizzo was an officer of each

12  of the foregoing companies.  She was an equal owner, she received equal shares of profits and

13  losses, and she knowingly and willfully used the proceeds of the Infringers' intentional torts

14  against Plaintiffs to pay her personal expenses and those of the luxury household she ran.

15        75.     The Fraudulent Transfer Action sought to impose constructive trusts on fraudulent

16  transfers from Close Combat and Noble to the foregoing companies.  The Honorable Robert P.

17  Contillo, P.J.Ch. entered an Order to Show Cause and Temporary Restraining Order on December

18  7, 2012, imposing the constructive trusts requested by Plaintiffs.  A copy of that Temporary

19  Restraining Order is attached as Exhibit 20.  Over the course of the Fraudulent Transfer Action,

20  Judge Contillo entered a preliminary injunction, and another Temporary Restraining Order on

21  CHP imposing a constructive trust on hundreds of thousands of dollars of additional wrongful

22  internet sales by CHP.  During the Fraudulent Transfer Action, Debtor Heather Pizzo and her

23  husband Christopher continued to operate Close Combat, and they siphoned off 70% of Close

24  Combat's cash based "profits," with no reserve or provision for the payment of Plaintiffs' Final

25  Judgment, despite the actual knowledge of Debtor Heather Pizzo and her husband Christopher that

26  the case against them was indefensible and that the damages were over $2,850,000.

27        76.     Christopher Pizzo, Debtor Heather Pizzo, and all of the companies owned and

28  controlled by them (collectively the "Pizzo Defendants") settled with Plaintiffs and agreed to

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

21

COMPLAINT

1  disgorge the overwhelming majority of the remaining liquid assets which had flowed to them as

2  fraudulent transfers from Noble and Close Combat.  In the Settlement Agreement between

3  Plaintiffs and the Pizzo Defendants, Christopher Pizzo, Noble and Close Combat (the "Judgment

4  Debtors") openly conceded that they acted intentionally and that they defrauded Plaintiffs by

5  falsely representing that they would not sell any products containing Plaintiffs' names and

6  likenesses and that they would not use Plaintiffs' names and likenesses to advertise or promote

7  any such sales and that their wrongful conduct was intentional.  A copy of the Settlement

8  Agreement containing representations and warranties to that effect is attached as Exhibit 21.  In

9  addition, pursuant to the Settlement Agreement, Christopher Pizzo agreed to issue a sworn

10  declaration (the "Declaration") and to testify in a deposition in the Fraudulent Transfer Action

11  concerning the fraudulent transfers made from Close Combat to certain other entities.  A copy of

12  his Declaration is attached as Exhibit 22.

13       77.    The Judgment Debtors made the following representations and warranties in the

14  Settlement Agreement attached as Exhibit 21 (emphasis added):

15     10.B.  Judgment Debtors jointly and severally represent, warrant and certify that
16  Plaintiffs alleged, and that the Arbitrator found that Judgment Debtors
17  represented through counsel that Judgment Debtors would not sell any
products containing Plaintiffs' names and likenesses and that they would
18  not use Plaintiffs' names or likeness to advertise or promote such sales.
**Judgment Debtors jointly and severally represent, warrant and certify**
19  **that they thereafter used Plaintiffs' names and likenesses to advertise,**
**market and promote the sale of products containing Plaintiffs names**
20  **and likenesses.  Judgment Debtors now certify that they acknowledge**
**and admit that their claim that they would not do so was false, that all**
21  **such sales were fraudulent, and that Judgment Debtors intentionally**
**used Plaintiffs' names and likenesses to sell products Judgment Debtors**
22  **had no right to sell at a discount, inflicting damages on Plaintiffs'**
**brand and reputation.**
23

24     10.C.  **Judgment Debtors jointly and severally represent, warrant and certify**
**that during the course of the parties' contractual relationship, they**
25  **produced monthly accountings of sales, expenses and commissions**
**owed, and that certain of those accountings were false and fraudulent**.
26  Judgment Debtors jointly and severally represent, warrant and certify that
they produced an accounting ordered in the Action, that the Arbitrator
27  ordered Judgment Debtors to produce all documents to corroborate all
revenue and expense figures contained in the accounting, and that Judgment
28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations
LA2426015.1
224594-10001
22
COMPLAINT

Debtors could not and did not produce documents to corroborate those claims. Judgment Debtors jointly and severally represent, warrant and certify that Plaintiffs alleged, and that the Arbitrator found that Judgment Debtors' revenue and expense claims in the accounting and certain revenue and expense claims in monthly accountings of sales and profits were false and fraudulent. **Judgment Debtors now certify that they acknowledge and admit that false and fraudulent revenue and expense figures in accountings were submitted to Plaintiffs, both during the course of the parties' Distribution Agreement and in the accountings submitted by Judgment Debtors in the Action, that they intended Plaintiffs to rely on those written misrepresentations, and that Plaintiffs did so reasonably.**

10.D.  **Judgment Debtors jointly and severally represent, warrant and certify that the Plaintiffs alleged, and that the Arbitrator found that the Judgment Debtors intentionally misappropriated Plaintiffs' names and likenesses, that Judgment Debtors acted with actual malice toward the Plaintiffs in the wrongful advertising and sale of products using Plaintiffs' names and likenesses, and that Judgment Debtors' conduct was so egregious as to warrant the imposition of punitive damages. Judgment Debtors now certify that they admit and acknowledge that the conduct that resulted in the Arbitration Award and the Judgment was intentional, and that they caused harm to Plaintiffs' brand and reputation for Judgment Debtors' pecuniary gain.**

Exhibit 21.  In addition, the following Pizzo Defendants made the following admissions:

10.E.  **...CHP certifies and admits that all Pizzo I.P. transferred to CHP was transferred by Christopher Pizzo to CHP after all of the wrongful acts that resulted in the Judgment had occurred, and that CHP's receipt of royalties, license payments and other revenues for the Pizzo I.P. were fraudulent transfers intended to obstruct, hinder and delay the collection of Plaintiffs' lawful claim against Christopher Pizzo.**

**...Noble Wealth certifies and admits that the money it received from Close Combat was actually Christopher Pizzo's share of Close Combat's profits pursuant to the Close Combat Operating Agreement, and that those funds were paid to Noble Wealth instead of Christopher Pizzo to defraud Plaintiffs and to hinder, delay and avoid payment to the Plaintiffs.**

...Christopher Pizzo acknowledges that he is a co-owner of the Condominium, and that **the down payment for the Condominium in the amount of $234,500 was provided by Judgment Debtor Noble Learning after all of the wrongful acts which resulted in the Judgment had occurred.** Heather Pizzo represents, warrants and certifies that any future transfer of the Pizzo I.P. and any future transfers by CHP, and/or Gracie Barra Irvine to her, or to any corporation, partnership, limited liability

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

COMPLAINT

company or other entity owned or controlled, in whole or in part, by her or for her benefit (including payment of any expenses for which she would otherwise be liable), after the Effective Date are prohibited by this Agreement and would be fraudulent as to Plaintiffs.

**...Knights certifies, represents and warrants that all assets in its possession were contributed, directly or indirectly, by Judgment Debtors, for no consideration, after Judgment Debtors committed all of the wrongful acts that resulted in the Judgment.**

Exhibit 21. Debtor Heather Pizzo co-owned and co-managed CHP and Noble Wealth, and she and her family vacationed in the Condominium. Debtor Heather Pizzo entertained her New Jersey friends and family in the Condominium that was directly funded with the proceeds of the malicious and intentional torts which the Pizzos perpetrated on Plaintiffs.

78.     Pursuant to paragraph 8 of the Settlement Agreement, Christopher Pizzo provided a Declaration to Plaintiffs which was prepared by his attorney and which documented certain affairs of Noble, Noble Wealth and Close Combat. A copy of that Declaration is attached as Exhibit 22. In that Declaration, Mr. Pizzo admits that Noble was "formed in 2003 with my wife Heather Pizzo," and that Close Combat was formed in October 2007 but did not open a bank account until April 1, 2008, Exhibit 22 (paragraph 7), compelling the conclusion that all wrongful sales of Plaintiffs' products that occurred from November 1, 2007 through March 31, 2008 were deposited into Noble's account despite being made on Close Combat's websites.

79.     Pursuant to the Settlement Agreement, Debtor Heather Pizzo, her husband Christopher and all of their companies entered into a Security Agreement pledging all of their assets to Plaintiffs. A copy of that Security Agreement is attached as Exhibit 23. The Security Agreement expressly defines Debtor Heather Pizzo, Christopher Pizzo and all of the Pizzo Defendants as the "Borrowers," and further provides that, "Borrowers own and are pledging as collateral to Lenders all of their assets, including but not limited to those set forth on Exhibit 1 attached hereto (the "Assets")." That Exhibit further specified the assets being pledged as the following:

> All unregistered copyrights and all intellectual property rights of any nature, including but not limited to the rights to use Debtors' name,

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

24

COMPLAINT

likenesses, all prior advertisements in any medium, and any facsimile or imposter of Debtors.

All photographs, moving pictures, digital images, videotape and all other media used or useful in promoting any of the products previously sold by Noble Learning Systems, Inc., Close Combat Company, LLC, and CHP Family Investment, LLC (excluding all products containing the names and likenesses of Damian Ross and/or Carl Cestari).

All of Debtors' interests in any companies, partnerships, corporations or other business ventures, including but not limited to stock in Noble Learning Systems, Inc. and Knights of the Republic, Inc., LLC membership interests in Close Combat Company, LLC, Noble Wealth Systems, LLC, Pizzo Wealth, LLC and CHP Family Investment, LLC, Debtors' interests in Tactical Wealth Academy, a California proprietorship and Christopher and Heather Pizzo's 100% partnership interest in Gracie Barra Irvine, a partnership owned by Christopher Pizzo and Heather Pizzo which owns and operates a franchised Gracie Barra martial arts school in Irvine, California (all of the foregoing companies and any companies in which Debtors obtain any after-acquired interest whatsoever are collectively referred to as the "Pizzo Companies").

All sums owed by any of the Pizzo Companies to Debtors for any reason, including loans payable, notes payable, distributions, profits, draws, salary, bonus, interest, dividends, royalties, management fees and any other payments.

All accounts receivable, notes receivable or other amounts of money owed to Debtors from any person or entity.

All cash, cash equivalents, coins, bullion, precious metals, and accounts owned by any of the Debtors, including but not limited to bank accounts, credit union accounts, brokerage accounts, mutual funds, bond funds, hedge funds, PayPal accounts, and accounts of financial institutions which process internet payments.

Securities, stocks, bonds, annuities, life insurance policies, and proceeds or payments due or that may be due to the Debtors from or on account of any policy of insurance.

All of Debtors' personal property including but not limited to electronics, computers, sound systems, telephones, and all software and data contained on any of the foregoing, jewelry, weapons, books, clothing, furniture, fixtures and equipment.

All domain names, websites, and facilities for transacting business on the internet.

All inventory, raw materials and work in process, together with all packaging materials related to any of the foregoing.

All lists or compilations of customers (including lists of purchases and sales) and all lists or compilations of vendors, suppliers and

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

25
COMPLAINT

contract counterparties (including lists of purchases and sales) with customers, vendors, suppliers and contract counterparties of any of the Pizzo Companies and all right, title and interest to any list of persons on all social media sites, including but not limited to Facebook and Twitter, of the Debtors individually.

All of the foregoing assets which Debtors may acquire in the future.

Proceeds and products of all of the foregoing.

80.     Plaintiffs' security interest was perfected against Debtor Heather Pizzo, her husband Christopher and all of their companies by filing UCC-1 Financing Statements against Heather and Christopher Pizzo individually in the State of California and against each of their companies in their respective jurisdictions of formation.  Copies of those Financing Statements are attached as Exhibit 24.  The Financing Statement filed against Christopher and Debtor Heather Pizzo individually covered the same collateral and was filed on November 25, 2013 with the California Secretary of State.  The Financing Statement filed against Noble covered the same collateral and was filed with the New Jersey Department of the Treasury on November 26, 2013. The Financing Statement against Close Combat covered the same collateral and was filed with the New Jersey Department of the Treasury on November 26, 2013.  The Financing Statement against Noble Wealth covered the same collateral and was filed with the Secretary of State of the State of Nevada on November 25, 2013.  The Financing Statement for Pizzo Wealth covered the same collateral and was filed with the New Jersey Department of the Treasury on November 26, 2013. The Financing Statement against CHP covered the same collateral and was filed with the Delaware Department of the Treasury on November 22, 2013.  The Financing Statement against Knights of the Republic covered the same collateral and was filed with the New Jersey Department of the Treasury on November 26, 2013.  The Financing Statements for Tactical Wealth Academy and Gracie Barra Irvine, both represented by the Pizzos to be partnerships, covered the same collateral and were filed on November 25, 2013 with the California Secretary of State.

81.     Debtor Heather Pizzo, her husband Christopher Pizzo and all of their companies paid Plaintiffs $500,000 pursuant to the Settlement Agreement and entered into a Consent Judgment for $1,165,000.  A copy of the Consent Judgment is attached as Exhibit 25.  Plaintiffs

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

26
COMPLAINT

1 | agreed to forebear from collection on the judgment so long as defendants honored their obligations

2 | pursuant to the Settlement Agreement.

3 |       82.    Debtor Heather Pizzo, her husband Christopher Pizzo and the Pizzo Defendants

4 | they controlled defaulted on April 21, 2014, when they failed to make a $50,000 payment due on

5 | that date pursuant to paragraph 3(B)(6) of the Settlement Agreement. Exhibit 21.

6 |       83.    Debtor Heather Pizzo, her husband Christopher Pizzo and the Pizzo Defendants

7 | they controlled defaulted again when they failed to remit, "all of seller's proceeds from the sale of

8 | the Condominium after payment of the first mortgage, taxes, realtor's commission and ordinary

9 | closing costs" to Plaintiffs when they sold the condominium which was purchased with

10 | fraudulently transferred funds. Exhibit 21 (paragraph 3.B.(6). In fact, in violation of the express

11 | terms of the Settlement Agreement, the sum of $15,998 was remitted to the State of New Jersey,

12 | Division of Taxation as estimated gross income tax for 2014, and on information and belief,

13 | Judgment Debtor Heather Pizzo and Christopher Pizzo received an increase in the amount of their

14 | annual New Jersey state tax return of that amount. A copy of the HUD-1 settlement statement

15 | documenting the withholding of that amount from Plaintiffs' proceeds on line 1207 is attached as

16 | Exhibit 26.

17 |       84.    After making the $500,000 initial payment, and except for the $50,000 payment

18 | due 180 days after the anniversary date of the Settlement Agreement, the Settlement Agreement

19 | allowed the Pizzo Defendants to retain all of the assets previously used to operate Close Combat

20 | (which sold Christopher Pizzo's martial arts content in DVD format) and CHP (which sold

21 | Christopher Pizzo's martial arts content in an on-line access format), plus interests in two new

22 | business ventures, Tactical Wealth Academy and Gracie Barra Irvine, plus approximately

23 | $100,000 in working capital. The Settlement Agreement granted the Pizzo Defendants

24 | forbearance against any remedies on their $1,665,000 Consent Judgment and against Plaintiffs'

25 | rights as secured creditors under the Security Agreement indefinitely, so long as the Pizzo

26 | Defendants remained in compliance with the Settlement Agreement, to allow the Pizzo

27 | Defendants to re-launch their business selling Christopher Pizzo's martial arts content and to

28 | pursue their new business ventures, Tactical Wealth Academy and Gracie Barra Irvine. After one

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

27
COMPLAINT

1  year, the Settlement Agreement required the Pizzo Defendants to make Monthly Installment

2  Payments, calculated as 25% of the Maximum Reasonable Monthly Profits from every company

3  and source of income to any of the Pizzo Defendants, all as defined in the Settlement Agreement,

4  to be determined in a binding arbitration process. Settlement Agreement, paragraph 3.C(1).

5       85.     In order to facilitate the Arbitrator's analysis of the amount of the Monthly

6  Installment Payments which the Pizzo Defendants owed to Plaintiffs, Exhibit 21, paragraph

7  3.C.(2) provided in pertinent part as follows:

8            On an annual basis, the Pizzo Defendants will provide Plaintiffs and
             the Installment Payments Arbitrator with unfettered access to all
9            books and records of all Pizzo Defendants and any business in
             which any of the Pizzo Defendants participates, acts as a
10           spokesperson for, or from which any Pizzo Defendant derives any
             profits, income, salary, independent contractor payments, royalties,
11           fees, management fees, compensation or any other financial benefit
             by the deadlines set forth above, provided however that if
12           Christopher Pizzo or Heather Pizzo are working as a W-2 employee
             at a company, and they have no equity or phantom equity, and they
13           are not an officer of the company, in lieu of producing the
             company's books and records, they shall produce all agreements
14           with the company, all other documents describing their
             compensation, benefits and other rights, paystubs, and W-2 forms.
15

16  As to the timing of that production of documents and information, paragraph 3.C.(1) provided,

17  "for the purpose of clarification, if the Effective Date fell in October 2013, the Pizzo Defendants

18  shall produce records from September 2013 through August 2014 by September 15, 2014; the

19  arbitration shall be complete by October 15, 2014; and the payment of Monthly Installment

20  Payments will begin on October 31, 2014…."

21       86.     Debtor Heather Pizzo, her husband Christopher Pizzo and all of the Pizzo

22  Defendants they controlled defaulted a third time when they failed to produce documents,

23  participate in an arbitration and to make Monthly Installment Payments due to commence on

24  October 31, 2014.

25       87.     After Defendants' defaults, Plaintiffs levied upon an account in the name of

26  Knights of the Republic, Inc., a private foundation funded by Debtor Heather Pizzo and her

27  husband Christopher Pizzo and controlled by them. Knights of the Republic, Inc. admitted that

28  the funds in its possession were fraudulently transferred to it. Plaintiffs obtained an Order, by

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

28

COMPLAINT

1   motion on notice to all defendants, without objection, for the turnover of all of those funds.  A

2   copy of Order for Turnover is attached as Exhibit 27.

3       88.    After applying recoveries from that levy, and the proceeds which Plaintiffs received

4   from the sale of the Condominium owned by Debtor Heather Pizzo and her husband Christopher

5   Pizzo, and adding post-judgment interest pursuant to New Jersey Civil Practice Rules, the balance

6   due on the Consent Judgment as of May 11, 2015, the deadline for filing this non-dischargeability

7   action, will be $943,927.01.  A calculation of the balance due it attached as Exhibit 28.

8       89.    The obligations owing to Plaintiffs are community claims within the meaning of

9   11 U.S.C. § 101.

10      90.    All of the obligations owing from Debtor Heather Pizzo and her husband

11  Christopher Pizzo were incurred in connection with the marital businesses owned by them.

12                                    **V.**

13                          **FIRST CLAIM FOR RELIEF**

14  **(For Non-Dischargeability Under 11 U.S.C. § 523(a)(6) by Plaintiffs Against Debtor Heather**

15      **Pizzo, Christopher Pizzo and the Community for Willful and Malicious Injury)**

16      91.    Plaintiffs reallege and incorporate into this paragraph by reference each and every

17  allegation of the prior paragraphs of this Complaint as though set forth at length herein.

18      92.    Christopher Pizzo and the other Infringers intentionally misappropriated Plaintiffs'

19  name and likeness in connection with products sold after the termination of the Distribution

20  Agreement, their packaging and their advertising

21      93.    The malicious intent with which defendants acted was litigated to a final

22  conclusion in the arbitration, reduced to a final judgment in the Superior Court of New Jersey and

23  upheld on appeal.

24      94.    The Infringers performed the actions complained of with knowledge that the acts

25  were wrongful and would cause injury or injuries to the names, likenesses and reputations of

26  Plaintiffs.

27      95.    Debtor Heather Pizzo participated in and ratified the actions of her husband,

28  Christopher Pizzo  and the remaining Infringers.  Debtor Heather Pizzo knew that her actions

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

29

COMPLAINT

1    would necessarily cause harm to Plaintiffs' brand and reputation, and that her fraudulent transfers

2    would impair Plaintiffs' rights to enforce their claims to recover their property.

3        96.    Upon information and belief, the actions of Heather and Christopher Pizzo were

4    undertaken either with the intent to injure Plaintiffs or the Pizzos believed that injury to Plaintiffs

5    was substantially certain to occur as a result of the Pizzos' conduct.

6        97.    Certain accountings issued by Noble to Close Combat while the parties were

7    transacting business in late 2007 and early 2008 were fraudulent.  The Arbitration Award

8    recovered by Plaintiffs so held, and the judgment entered on the Arbitration Award and sustained

9    on appeal also so held.  In addition, Christopher Pizzo, Noble and Close Combat admitted this

10   fraud in the Settlement Agreement.  On information and belief, Debtor Heather Pizzo, the

11   Treasurer of Noble and the wife and business partner of Christopher, participated in those

12   accountings and withheld and refused to produce business records in connection with those

13   accountings.

14       98.    The Accounting produced in response to the Chancery Division's Temporary

15   Restraining Order was fraudulent in that it understated Noble's actual revenues and overstated

16   Noble's returns and expenses.  The Arbitration Award recovered by Plaintiffs so held, and the

17   judgment entered on the Arbitration Award and sustained on appeal also so held.  In addition,

18   Christopher Pizzo, Noble and Close Combat admitted this fraud in the Settlement Agreement.  On

19   information and belief, Debtor Heather Pizzo, the Treasurer of Noble and the wife and business

20   partner of Christopher, intentionally and knowingly withheld and refused to produce business

21   records in connection with the Accounting, despite having undertaken an affirmative duty to do

22   so.

23       99.    Debtor Heather Pizzo and her husband Christopher Pizzo actively participated in

24   and directly benefitted from fraudulent transfers from Noble and Close Combat into jointly owned

25   and operated companies.

26       100.    Debtor Heather Pizzo, acting as a 50% owner, an employee with a written

27   Employment Agreement that designated her as a Financial Officer, and who was continuously the

28   officially designated Treasurer of Noble, rebranded Noble into Close Combat, comingling

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

30

COMPLAINT

1    hundreds of thousands of dollars of assets and liabilities.  Debtor Heather Pizzo used Noble's

2    resources from Thanksgiving 2007 through April 1, 2008 to launch Close Combat and to deposit

3    the proceeds of products sold on Close Combat's website into Noble's account.

4        101.    Debtor Heather Pizzo and her husband Christopher Pizzo then looted Noble's

5    assets with fraudulent transfers into their Condominium deposit, paying "royalties" to Pizzo

6    Wealth and "management fees" and "marketing" expenses into Noble Wealth, making individual

7    fraudulent transfers to themselves, and transferring Noble's customer list to Close Combat and

8    Close Combat's right to sell Christopher Pizzo's content to CHP.  The bank accounts of Pizzo

9    Wealth, Noble Wealth and CHP were used to pay the mortgage, rent and personal expenses of

10   Debtor Heather Pizzo and her husband Christopher.

11                                              **VI.**

12                               **SECOND CLAIM FOR RELIEF**

13   **(For Non-Dischargeability Under 11 U.S.C. § 523(a)(4) by Plaintiffs Against Debtor Heather**

14                **Pizzo, Christopher Pizzo and the Community for Embezzlement)**

15       102.    Plaintiffs reallege and incorporate into this paragraph by reference paragraphs 1

16   through 90 of this Complaint as though set forth at length herein.

17       103.    Pursuant to the Distribution Agreement, Plaintiffs entrusted to Noble martial arts

18   instructional content containing Plaintiffs' name and likeness, together with photographs of

19   Damian Ross and his biography, all to be used for the sole purpose of advertising, packaging,

20   marketing and selling products containing Plaintiffs' name and likeness for the duration of and

21   pursuant to the terms and conditions of the Distribution Agreement.

22       104.    After the Distribution Agreement was concluded and the Infringers had represented

23   through counsel that they would not make any further sales of Plaintiffs' products, Noble and

24   Close Combat used Plaintiffs' intellectual property to make e-mail and internet sales which

25   damaged Plaintiffs in amounts ultimately adjudicated to exceed $2,850,000.

26       105.    The Infringers (including Christopher Pizzo) exploited Plaintiffs' name and

27   likeness without the lawful right to do so, while attempting to deceive and conceal this from

28   Plaintiffs by making false representations to the contrary through their counsel.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

31

COMPLAINT

106.    Debtor Heather Pizzo caused the transfer of funds, the proceeds of the embezzled property, to be transferred into accounts into which she and Christopher Pizzo had exclusive access.

107.    Christopher Pizzo participated with his wife, Debtor Heather Pizzo, in the concealment of the transfer of funds from Noble and Close Combat to Pizzo Wealth, Noble Wealth, CHP and the Pizzos themselves.

108.    The disbursement of funds as described herein was without any lawful purpose, and was instead done to hinder, delay or defraud Plaintiffs.

109.    The conduct of Debtor Heather Pizzo and Christopher Pizzo constitutes embezzlement.

**VII.**

**THIRD CLAIM FOR RELIEF**

**(Objection to Discharge Under 11 U.S.C. § 727(a)(4) by Plaintiffs against Debtor Heather Pizzo, Christopher Pizzo and the Community for False Oaths)**

110.    Plaintiffs reallege and incorporate into this paragraph by reference paragraphs 1 through 90 of this Complaint as though set forth at length herein.

111.    Plaintiffs allege on information and belief that the Schedules and Statements of Affairs that Debtor Heather Pizzo filed with this bankruptcy on January 27, 2015, all of which she signed under penalty of perjury, are all oaths that Debtor Heather Pizzo made in connection with this bankruptcy case.

112.    Plaintiffs allege on information and belief that Debtor Heather Pizzo read all of Debtor Heather Pizzo's Bankruptcy Schedules and Statements of Affairs and was represented by counsel when she signed her Bankruptcy Schedules and Statements of Affairs.

113.    Plaintiffs allege on information and belief that Debtor Heather Pizzo had personal knowledge of all of the representations that she made to the Bankruptcy Court in her bankruptcy Schedules and Statements of Affairs and assented to the filing of those bankruptcy Schedules and Statements of Affairs.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

114.   Debtor Heather Pizzo's oaths are false because the Schedules and Statements of Affairs are false and self-contradictory as follows:

(A)   Schedule D – Secured Creditors is understated because it fails to identify approximately $943,927 in secured debts to Plaintiffs and because it falsely identifies Plaintiffs as unsecured creditors.

(B)   Schedule F – Unsecured Creditors is overstated by $2,851,222 because Debtor Heather Pizzo falsely included the amount of the original Final Judgment entered on the Arbitration Award, despite having superseded that Final Judgment with a Consent Judgment secured by every asset owned by Debtor Heather Pizzo, her husband Christopher and all of their companies.  Compare Final Judgment attached as Exhibit 13 with Consent Judgment attached as Exhibit 25.

(C)   Debtor Heather Pizzo falsely claimed an executory contract with CHP in Schedule G when the Settlement Agreement contains a representation and warranty by her that all martial arts intellectual property was transferred from CHP back to Christopher Pizzo, individually, with her knowledge and written assent, subject to a License Agreement from Christopher Pizzo to CHP which terminated upon the defendants' breach of the Settlement Agreement, which undisputedly happened on April 21, 2014, leaving Christopher Pizzo as the sole owner of all martial arts intellectual property and Debtor Heather Pizzo with no executory contract or other rights to any of the martial arts intellectual property or any of the revenues generated from the sale of the same.

(D)   Debtor Heather Pizzo falsely identified the average monthly income from the sale of martial arts videos for her non-filing spouse as $2,500 per month when, on information and belief, actual receipts from the continuing sale of those products is substantially greater than that amount.

(E)   A Schedule reflecting Close Combat's transfers to Noble Wealth is attached as Exhibit 29.  Debtor Heather Pizzo falsely stated on her Statement of Financial Affairs that estimated 2012 gross income for the debtor and her husband Christopher Pizzo from Noble Wealth totaled $213,744, when transfers from Close Combat to Noble Wealth for the year were

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

33
COMPLAINT

$634,563.68 through August 1, 2012, plus $118,109.99 in December 2012, totaling $752,673.67 in 2012. On information and belief, Noble Wealth had little or no legitimate business expenses in 2012 because it was not a legitimate business.

(F)    Debtor Heather Pizzo's Statement of Financial Affairs falsely identifies that the matter Zenshin, LLC, et al. v. Close Combat, et al., Docket Number BER-C-358-12 was "pending" on January 27, 2015, despite the fact that a Consent Judgment concluding the matter as to debtor, her husband and all of their companies was filed on January 2, 2014.

(G)    Debtor Heather Pizzo falsely stated in her Statement of Financial Affairs that "debtor did not receive any proceeds from transfer," in connection with the sale of the Condominium on April 23, 2014, materially omitting that Debtor Heather Pizzo and her husband Christopher withheld $15,998 in sales proceeds by making a payment in that amount to the State of New Jersey Division of Taxation for 2014 estimated New Jersey income taxes, which, on information and belief, Debtor Heather Pizzo and her husband Christopher recovered when they filed their New Jersey state income tax returns.

(H)    Debtor Heather Pizzo falsely stated in her Statement of Financial Affairs that on January 27, 2015, that Knights of the Republic, Inc. held a brokerage account in the amount of $120,000, stating, "debtor has access to account as manager and board member of foundation," when, in fact, Plaintiffs had recovered all funds in the Knights of the Republic, Inc. account by September 30, 2014.

115.    Plaintiffs allege on information and belief that Debtor Heather Pizzo made all of these false oaths knowingly and with the intent to defraud creditors and the trustee in bankruptcy, by intentionally devaluing the assets of the estate, falsely inflating Debtor Heather Pizzo's creditor pool, filing inconsistent schedules so that no one knows the true state of Debtor Heather Pizzo's financial condition, and falsely categorizing the debt owed to Plaintiffs as an overstated unsecured debt when, in fact, it is secured to the extent of the assets of the Debtor Heather Pizzo, her husband Christopher Pizzo and all of their companies.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

34

COMPLAINT

1    116.    Plaintiffs therefore allege, on information and belief, that Debtor Heather Pizzo is

2    not eligible for discharge of any of her debts pursuant to 11 United States Code

3    Section 727(a)(4)(A).

4                                          **VIII.**

5                              **FOURTH CLAIM FOR RELIEF**

6    **(Objection to Discharge Under 11 U.S.C. § 727(a)(2) by Plaintiffs Against Debtor Heather**

7    **Pizzo, Christopher Pizzo and the Community for Concealment of Property Within One Year**

8                          **Before the Date of Bankruptcy)**

9    117.    Plaintiffs reallege and incorporate into this paragraph by reference paragraphs 1

10    through 90 of this Complaint as though set forth at length in full.

11    118.    Pursuant to Paragraphs 3.C.(1) and (2) of the Settlement Agreement, Debtor

12    Heather Pizzo, Christopher Pizzo and all of the Pizzo Defendants were required to keep detailed

13    books and records of every company which they operated after the Effective Date of the

14    Settlement Agreement and to provide the Installment Payments Arbitrator "with unfettered access

15    to all books and records of all of the Pizzo Defendants in any business in which any of the Pizzo

16    Defendants participates, acts as a spokesman for, or from which any Pizzo Defendant derives any

17    profits, income, salary, independent contract or payments, royalties, fees, management fees,

18    compensation or any other financial benefit...."

19    119.    Debtor Heather Pizzo, Christopher Pizzo and the Pizzo Defendants failed and

20    refused to produce any of the foregoing records despite their obligation to produce all records

21    from September 2013 through August 2014 by September 15, 2014.

22    120.    Debtor Heather Pizzo's bankruptcy was filed less than four months after the

23    obligation to produce all of the foregoing documents and information matured.

24    121.    Upon information and belief, Debtor Heather Pizzo and Chris Pizzo are concealing

25    assets and property concerning the operations of their businesses.

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

35

COMPLAINT

## IX.

## FIFTH CLAIM FOR RELIEF

**(Objection to Discharge Under 11 U.S.C. § 727(a)(3) by Plaintiffs Against Debtor Heather Pizzo, Christopher Pizzo and the Community for Concealment of Records, Failure to Keep Records, or Falsification of Records From Which the Debtor's Financial Condition Could be Ascertained)**

122.    Plaintiffs reallege and incorporate into this paragraph by reference paragraphs 1 through 90 this Complaint as though set forth at length in full.

123.    After the Settlement Agreement allowed Debtor Heather Pizzo and her husband Christopher Pizzo to keep CHP, Tactical Wealth Academy and Gracie Barra Irvine, three functioning businesses which were jointly owned and operated, but required them to grant Plaintiffs "unfettered access" to all books and records of every business enterprise that they operated and every source of payments to them, in January 2015, Debtor Heather Pizzo filed Bankruptcy Schedules and Statements of Affairs that could not accurately set forth, and in fact contained contradictory information concerning how much money she and her husband Christopher earned from those businesses in 2013, the base year for those calculations. On information and belief, Debtor Heather Pizzo, Christopher Pizzo and the Pizzo Defendants have either concealed records, failed to keep records or falsified records from which the debtor's financial condition could be ascertained.

///

///

///

///

///

///

///

///

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

36

COMPLAINT

## X.

## PRAYER FOR RELIEF

124.    Plaintiffs pray for relief as follows:

(A)    That the Court determine that Debtor Heather Pizzo liable to Plaintiffs for the amount of at least $943,927.00, and attorney time, expenses and costs that Plaintiffs have incurred and will incur to prosecute this adversary proceeding, plus pre and post-judgment interest on all amounts notwithstanding any discharge of Debtor Heather Pizzo that this Court may enter; and

(B)    That the Court determine that the debt that Debtor Heather Pizzo owes Plaintiffs is non-dischargeable;

(C)    That the Court determine that the debt that Christopher Pizzo owes to Plaintiffs would be non-dischargeable in his hypothetically filed bankruptcy case;

(D)    That the Court determine that Debtor Heather Pizzo is not entitled to a discharge of any of her debts;

(E)    That Christopher Pizzo would be denied a discharge in his hypothetical bankruptcy case;  and

(F)    For such other and further relief as the Court deems just and proper.

DATED:    MAY 8, 2015    DUGHI, HEWIT & DOMALEWSKI, P.C.

Charles M. Radler, Jr.

By:_____
Charles M. Radler, Jr.
Attorneys for Defendants
ZENSHIN, LLC and DAMIAN ROSS

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2426015.1
224594-10001

37
COMPLAINT

**EXHIBIT 1**



# New Jersey State Business Gateway Service
## Corporate and Business Information Reporting

## Business Entity Status Report

**Printing Instructions:** Open your Browser's Page Setup menu and set your page margins to 0.25". Use your Browser's Print option to print the report as seen on screen.
**Saving Instructions:** Save this file to your hard drive for later viewing by using the Browser's "Save As" function.

All available information is displayed.

| | |
|---|---|
| **Business Name: NOBLE LEARNING SYSTEMS INC.** | **Report Date: 12/03/2007** |
| **Business ID Number: 0100910115** | **Transaction Number: Sequence: 1221322: 1** |

**Business Type: DOMESTIC PROFIT CORPORATION**

**Status: ACTIVE**

| | |
|---|---|
| **Filing Date: 08/19/2003** | **Home Jurisdiction: NJ** |
| **Status Change Date:** | **Stock Amount: 25000** |
| **DOR Suspension Start Date:** | **DOR Suspension End Date:** |
| **Tax Suspension Start Date:** | **Tax Suspension End Date:** |

**Annual Report Month: 8**

**Last Annual Report Filed: 06/23/2006**

**For Last Annual Report Paid Year: 2006**

**Incorporator: CHERI S HILL**

**Agent: CHRISTOPHER PIZZO**

**Agent Address: 195 LEVINBERG LANE**

**WAYNE, NJ 07470**

**Office Address Status: Deliverable**

**Main Business Address: 195 LEVINBERG LANE**

CLAIMANTS 000434

**WAYNE, NJ 07470**

Principal Business Address:

Associated Names

   Name:                                                                    Type Description:

Officers/Directors/Members

1)  **Title:**      **PRESIDENT**

    **Name:**      **CHRISTOPHER LPIZZO**

    **Address:**    **195 LEVINBERG LANE**

                **WAYNE, NJ 07470**

2)  **Title:**      **TREASURER**

    **Name:**      **HEATHER PIZZO**

    **Address:**    **195 LEVINBERG LANE**

                **WAYNE, NJ 07470**

 Exit            Return to Main List

**\*\*If you would like to receive photocopies of documents filed by this business entity, mail your request to PO Box 450, Trenton, NJ 08625. Indicate the Business Entity Number(s) involved and the type of document you wish to have copies of. Your choices are listed below:**

**CHARTER DOCUMENTS**
- Original Certificate Only (For example, Certificate of Incorporation);
- Changes and Amendments to the Original Certificate Only; OR
- All Charter Documents (Original Certificate and Changes/Amendments)
    And/or

**ANNUAL REPORTS**
- Copy of Latest Annual Report; OR
- Copy of Annual Report for a Specific Year(s) (List the Year Desired)

The photocopy fee for all entities except limited liability companies is $1 per page. For limited liability companies, the fee is $10 for the first page and $2 per page thereafter.

The total fee amount for your order will vary depending on the number of pages associated with each filed document you request. You may supply us with a check with a NOT TO EXCEED instruction to cover the costs. Make the check payable to the Treasurer, State of New Jersey. Alternately, you may pay by credit card (provide card#/expiration date and cardholder information) or depository account. Please include a self-addressed envelope with your order. If you have any questions or would like information on alternative service options such as over-the-counter expedited service, call 609-292-9292 (option 3 on the main menu and then option 8), weekdays, 8:30 a.m. to 4:30 p.m.

CLAIMANTS 000435

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0100910115

Status Report For:      NOBLE LEARNING SYSTEMS INC.
Report Date:            6/4/2013
Confirmation Number:    3155289754

## IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION

Business ID Number:     0100910115
Business Type:          DOMESTIC PROFIT CORPORATION
Status:                 DISSOLVED AFTER COMMENCING BUSINESS
Original Filing Date:   08/19/2003
Stock Amount:           25000
Home Jurisdiction:      NJ
Status Change Date:     12-28-2011

## REVOCATION/SUSPENSION INFORMATION

DOR Suspension Start    03-16-2010
Date:
DOR Suspension End      02-28-2011
Date:
Tax Suspension Start    N/A
Date:
Tax Suspension End      N/A
Date:

## ANNUAL REPORT INFORMATION

Annual Report Month:    AUGUST
Last Annual Report      05/26/2011
Filed:
Year:                   2011

## AGENT/SERVICE OF PROCESS (SOP) INFORMATION

Agent:                  CHRISTOPHER PIZZO
Agent/SOP Address:      441 DEVONSHIRE DRIVE ,FRANKLIN LAKES,NJ,07417
Address Status:         DELIVERABLE
Main Business Address:  441 DEVONSHIRE DRIVE,FRANKLIN LAKES,NJ,07417
Principal Business      441 DEVONSHIRE DRIVE,FRANKLIN LAKES,NJ,07417
Address:

## ASSOCIATED NAMES

Associated Name:        N/A
Type:                   N/A

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0100910115

PRINCIPALS

Following are the most recently reported officers/directors (corporations),
managers/members/managing members (LLCs), general partners (LPs), trustees/officers
(non-profits).

| | |
|---|---|
| Title: | TREASURER |
| Name: | PIZZO,HEATHER |
| Address: | 441 DEVONSHIRE DRIVE ,FRANKLIN LAKES,NJ 07417 |
| Title: | TREASURER |
| Name: | PIZZO,HEATHER |
| Address: | 441 DEVONSHIRE DRIVE ,FRANKLIN LAKES,NJ 07417 |

FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND
LIMITED LIABILITY PARTNERSHIPS

To order copies of any of the filings below, return to the service page,
https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions
for obtaining copies. Please note that trade names are filed initially with the County
Clerk(s) and are not available through this service. Contact the Division for
instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

| | |
|---|---|
| Original Filing (Certificate)Date: | 2003 |

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| DISSOLVED WITH A TAX CLEARANCE | 2011 |
| CHANGE OF AGENT AND OFFICE | 2010 |
| REVOKED FOR FAILURE TO PAY ANNUAL REPORTS | 2010 |
| REINSTATED (ANNUAL REPORTS) | 2011 |

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0100910115

```
DISSOLUTION/WITHDRAWAL  2011
PROCEEDINGS PENDING
REINSTATEMENT PROCESS   2010
PENDING
```

Note:
Copies of some of the charter documents above, particularly those filed before August
1988 and recently filed documents (filed less than 20 work days from the current date),
may not be available for online download.

- For older filings, contact the Division for instructions on how to order.
- For recent filings, allow 20 work days from the estimated filing date, revisit the
  service center at https://www.njportal.com/DOR/businessrecords/Default.aspx
  periodically, search for the business again and build a current list of its
  filings. Repeat this procedure until the document shows on the list of documents
  available for download.

The Division cannot provide information on filing requests that are in process. Only
officially filed documents are available for download.

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0100910115

| | |
|---|---|
| Status Report For: | NOBLE LEARNING SYSTEMS INC. |
| Report Date: | 1/14/2015 |
| Confirmation Number: | 5014583887 |

## IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION

| | |
|---|---|
| Business ID Number: | 0100910115 |
| Business Type: | DOMESTIC PROFIT CORPORATION |
| Status: | DISSOLVED AFTER COMMENCING BUSINESS |
| Original Filing Date: | 08/19/2003 |
| Stock Amount: | 25000 |
| Home Jurisdiction: | NJ |
| Status Change Date: | 12-28-2011 |

## REVOCATION/SUSPENSION INFORMATION

| | |
|---|---|
| DOR Suspension Start Date: | 03-16-2010 |
| DOR Suspension End Date: | 02-28-2011 |
| Tax Suspension Start Date: | N/A |
| Tax Suspension End Date: | N/A |

## ANNUAL REPORT INFORMATION

| | |
|---|---|
| Annual Report Month: | AUGUST |
| Last Annual Report Filed: | 05/26/2011 |
| Year: | 2011 |

## AGENT/SERVICE OF PROCESS (SOP) INFORMATION

| | |
|---|---|
| Agent: | CHRISTOPHER PIZZO |
| Agent/SOP Address: | 441 DEVONSHIRE DRIVE ,FRANKLIN LAKES,NJ,07417 |
| Address Status: | DELIVERABLE |
| Main Business Address: | 441 DEVONSHIRE DRIVE,FRANKLIN LAKES,NJ,07417 |
| Principal Business Address: | 441 DEVONSHIRE DRIVE,FRANKLIN LAKES,NJ,07417 |

## ASSOCIATED NAMES

| | |
|---|---|
| Associated Name: | N/A |
| Type: | N/A |

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0100910115

PRINCIPALS

Following are the most recently reported officers/directors (corporations),
managers/members/managing members (LLCs), general partners (LPs), trustees/officers
(non-profits).

| | |
|---|---|
| Title: | TREASURER |
| Name: | PIZZO,HEATHER |
| Address: | 441 DEVONSHIRE DRIVE ,FRANKLIN LAKES,NJ 07417 |
| Title: | TREASURER |
| Name: | PIZZO,HEATHER |
| Address: | 441 DEVONSHIRE DRIVE ,FRANKLIN LAKES,NJ 07417 |

FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND
LIMITED LIABILITY PARTNERSHIPS

To order copies of any of the filings below, return to the service page,
https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions
for obtaining copies. Please note that trade names are filed initially with the County
Clerk(s) and are not available through this service. Contact the Division for
instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

| | |
|---|---|
| Original Filing (Certificate)Date: | 2003 |

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| Dissolved With A Tax Clearance | 2011 |
| CHANGE OF AGENT AND OFFICE | 2010 |
| REVOKED FOR FAILURE TO PAY ANNUAL REPORTS | 2010 |
| REINSTATED (ANNUAL REPORTS) | 2011 |

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 0100910115

```
DISSOLUTION/WITHDRAWAL 2011
PROCEEDINGS PENDING
REINSTATEMENT PROCESS   2010
PENDING
```

Note:
Copies of some of the charter documents above, particularly those filed before June
1988 and recently filed documents (filed less than 20 work days from the current date),
may not be available for online download.

- For older filings, contact the Division for instructions on how to order.
- For recent filings, allow 20 work days from the estimated filing date, revisit the
  service center at https://www.njportal.com/DOR/businessrecords/Default.aspx
  periodically, search for the business again and build a current list of its
  filings. Repeat this procedure until the document shows on the list of documents
  available for download.

The Division cannot provide information on filing requests that are in process. Only
officially filed documents are available for download.

**EXHIBIT 2**

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made effective as of January 02, 2014 by and between Noble Learning Systems, Inc. ("Noble Learning") of 95 Lawrence Lane, Wayne, New Jersey 07470 and the address of 95 Lawrence Lane, Wayne, New Jersey 07470.

1. EMPLOYMENT. Noble Learning shall employ Heather Pizza as a General Officer. Heather Pizza accepts and agrees to such employment, subject to the general supervision, advice, and direction of Noble Learning and Noble Learning's key officer personnel. Heather Pizza agrees to perform faithfully, industriously, and to the best of Heather Pizza's ability, experience, and talents, the services required to deliver, (i) ... 

2. COMPENSATION. As compensation for the services provided by Heather Pizza under this Agreement, Noble Learning will pay Heather Pizza the annual salary of $45,000.00 payable in accordance with Noble Learning's normal payroll processing, as well as corresponding deduction requirements.

3. EXPENSE REIMBURSEMENT. Noble Learning will reimburse Heather Pizza for out-of-pocket expenses incurred by Heather Pizza in accordance with Noble Learning's policies in effect from time to time.

4. CONFIDENTIALITY. Heather Pizza recognizes that Noble Learning has and will have information regarding the following ...

5. TERMINATION. Heather Pizza ... may terminate this Agreement at any time with or without cause.

**ENTIRE AGREEMENT.** This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties. Amendments to this Agreement must be made in writing and signed by both parties to be binding on either party.

**EMPLOYER:**
Noble Learning Systems, Inc.


By: _____                    Date: _____


**EMPLOYEE:**


_____                        Date: _____
Heather Rizzo

**EXHIBIT 3**

Jan 21 13 10:00a          Noble Wealth Systems

## Marketing Agreement

This Marketing Agreement (this "Agreement") dated as of June 18, 20__ (the "Effective Date"), is between Noble Wealth Systems, LLC DBA IACCP ("IACCP") located at 1016 Terminal Way, STE 209, Reno, Nevada 89502 and Noble Learning Systems, Inc., ("Noble Learning") located at 400 Drake Street, Ramsey, New Jersey 07446. IACCP and Noble Learning, are sometimes individually referring as a "Party" and collectively referred to as the "Parties".

WHEREAS, IACCP and Noble Learning desire to establish a non-exclusive, strategic marketing agreement whereby Noble Wealth Systems, LLC DBA IACCP will promote Noble Learning Systems, Inc.'s products and services. This Agreement may be modified from time to time, in the form of a written instrument signed by both Parties (an "Amendment"). In the event any Amendment is created during this Agreement will be subject to the terms of this Agreement unless otherwise stipulated in the Amendment.

1.   SCOPE OF ACTIVITIES. The Parties will undertake the activities described in Appendix A. Due to this relationship, the their respective obligations to undertake the activities listed in Appendix A for good and valuable consideration for this Agreement.

2.   REPORTING. Within ten (10) days after the end of each calendar month during this Agreement, Noble Wealth Systems, LLC DBA IACCP will provide Noble Learning Systems, Inc. with (or will provide access to) a monthly report detailing the number of each Party determine the value that are generated as the revenues are associated with products and services, and described in this Agreement.

3.   LICENSES. Noble Learning grants to IACCP a non-exclusive, non-transferable royalty free license to use Noble Learning's tradename, trademarks, logos and service marks (collectively "Marks") in connection with the performance of this Agreement. IACCP shall not use any of Noble Learning's Marks for any purpose other than that clearly defined in writing, in advance, by either Noble Learning. IACCP will not file or register any application or register or modify or cancel any application for use of Noble Learning's Marks or use any confusingly similar thereto without Noble Learning's prior written approval. Except as expressly provided in this Agreement, nothing in this agreement shall constitute IACCP any right, title or interest in or to the Marks or in the goodwill of Noble Learning. IACCP acknowledges that Noble Learning's Marks, and any derivatives will are the sole and exclusive property of Noble Learning, and IACCP agrees not to (1) seek to alter, modify or to contest the use of Noble Learning or Noble Learning's ownership of any trademark, tradename or service mark possibly IACCP during the term of this Agreement. IACCP shall cooperate with any actions to protect Noble Learning's Marks or the registration of, take no action that infringes or otherwise impairs or diminishes and are in any way confusingly similar to Noble Learning's Marks.

Noble Learning acknowledges that the sole ownership of all the Marks and other intellectual property rights that are licensed to IACCP acknowledges that no utilization of Noble Learning's Marks will not create in IACCP will continue such as any right, title or

interest in or to Noble Learning's Marks other than the express limited right to use
Noble Learning's Marks on IACCP's Web site granted under this Agreement. The
goodwill from IACCP's use of Noble Learning's Marks, if any, shall accrue solely to
the benefit of Noble Learning. IACCP agrees that it shall cease using Noble Learning's
Marks immediately upon request, and in no event shall this license survive the term of this
Agreement.

4.    **TERM AND TERMINATION.** The term of this Agreement shall be 36 months months
from the Launch Date, unless terminated earlier pursuant to the provisions of this
Agreement. The Launch Date shall be the date when Noble Learning's Promotional Offer
is presented live on IACCP's web site. Thereafter, the terms will automatically renew for
successive 12-month terms without notice.

a.    Termination for Cause. If either Party materially defaults in the performance of
any provision of this Agreement, and such default is not cured within 30 days after
the non-defaulting Party gives the defaulting Party written notice of such default,
then the non-defaulting Party shall be entitled to terminate this Agreement
immediately upon written notice of termination to the defaulting Party.

b.    Effect of Termination. Termination shall not relieve either Party of any
obligation incurred prior to the termination. Upon termination, IACCP agrees to
(i) cease all promotion of Noble Learning's services, (ii) cease all use of Noble
Learning's Technology and Marks, and (iii) cease making Noble Learning's
services available on or through any website or otherwise, and to promptly return
or destroy all copies and any embodiments of Noble Learning's products,
technology and any other confidential or proprietary information that IACCP's
possess in their control. Without limiting the foregoing in any way, the Parties agree
that nothing in this termination, each Party may continue to make their
products or services available directly or to recommending to the product/service,
without recommendation, without any liability or obligation to the other Party.

5.    **WARRANTIES; DISCLAIMER.**

a.    Warranties. Each Party represents and warrants to the other that:

i.    it has the full corporate right and authority to enter into this Agreement and to
perform the acts required of it hereunder;

ii.    the execution of this Agreement by such Party and the performance by such Party
of its obligations and duties hereunder do not and will not violate any other
Agreement to which such Party is a Party or by which it is otherwise bound;

iii.    when executed and delivered by such Party, this Agreement shall constitute the
legal, valid and binding obligation of such Party, enforceable against such Party,
according to its terms;

iv.    such Party acknowledges that the other Party makes no representation,
warranties or Agreements related to the subject matter hereof that are not

Jan 21 13 10:00a    Noble Wealth Systems    p.6

expressly specified in this Agreement.

DISCLAIMER. EXCEPT AS EXPRESSLY SET FORTH HEREIN, NEITHER PARTY MAKES AND EACH PARTY HEREBY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE PRODUCTS AND SERVICES CONTEMPLATED BY THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTY OF NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.

INDEMNIFICATION

IACCP Duty to Indemnify. IACCP will indemnify, defend and hold Noble Learning and its directors, officers, employees and agents harmless from any and all costs, expenses (including reasonable attorneys' fees), losses, damages, or liabilities incurred as a result of any such costs, expense, losses, damages, or liabilities to the extent that the IACCP's technology or the IACCP's Materials infringe any intellectual property rights of a third party.

Noble Learning Duty to Indemnify. Noble Learning will indemnify, defend and hold IACCP and its directors, officers, employees and agents harmless from any and all costs, expenses (including reasonable attorneys' fees), losses, damages, or liabilities incurred as a result of any such costs, expense, losses, damages, or liabilities to the extent that the Noble Learning technology or the Noble Learning Materials infringe any intellectual property rights of a third party.

Indemnified Party Procedures. The indemnified party shall give the indemnifying party with prompt written notice of any such claim. The indemnifying party shall have sole control and authority with respect to the defense and settlement of any such claim. The indemnified Party shall cooperate fully with the indemnifying Party, at the indemnifying Party's sole cost and expense, in the defense of any such claim. The indemnifying party shall not agree to any such claim that does not include a complete release of the indemnified party from all liability with respect thereto or that imposes any liability or obligation on the indemnified party, without the right to prior consent of the indemnified party. The indemnified party may participate in the defense of any claim through its own counsel and at its own expense.

CONFIDENTIALITY

Protection of Information. The parties may provide each other with confidential information and trade secrets, including without limitation, information on their respective organizations, finances, personnel, services, systems, pricing structure, proprietary products and processes, transactions and/or business relations (collectively, the "Information"). The term "Information" shall not include

(i) information generally available to the public through no fault of the other party, (ii) information which the other party already had prior to the date of (iii) information which has become part of the public domain through no fault of a party. Each Party agrees to maintain in confidence all files, and to permit its employees, consultants, professionals, or representatives access only to such information in confidence. All information disclosed by the other Party. Each Party shall only use the other's information solely for the purpose of performing obligations under this Agreement, and only disclose the Confidential Information on a need to know basis, provided that such party shall be liable for the acts of any third party who obtains the Confidential Information from such party. Each party shall exercise every precaution in handling the Confidential Information as it does for its own Confidential information on a need to know basis. Further, the receiving Party may disclose Information to the extent that it is required by subpoena, other legal process, or requirement of law, after giving the disclosing Party a reasonable opportunity to contest such disclosure requirement.

ii.  Injunctive Relief. Each Party acknowledges and agrees that any unauthorized use of Confidential Information by the Party in a manner inconsistent with the provisions of this Agreement may cause another Party harm which will not be compensated. In monetary damages alone, and accordingly, each such Party will, in addition to other available legal or equitable remedies, be entitled to seek an immediate injunction restraining the disclosing Party or from continuing, threatening, or committing such unauthorized use. A breach hereby available injunctive, relief in addition will, without prejudice to any other remedies available to it.

Survival. This Section 8 will survive the termination or expiration of this Agreement.

8.  LIMITATION OF LIABILITY. THE PARTIES AGREE THAT IN NO EVENT SHALL EITHER PARTY NOR ITS AFFILIATES BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL, PUNITIVE, OR OTHER INDIRECT DAMAGES OF ANY NATURE, FOR ANY REASON, INCLUDING WITHOUT LIMITATION, THE BREACH OF THIS AGREEMENT OR ANY EXPIRATION OR TERMINATION OF THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), OR OTHERWISE, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, (i) NO EXTENT WILL EITHER PARTY (i) BE LIABLE FOR LOST PROFITS OR LOST BUSINESS OPPORTUNITIES ARISING OUT OF THE TERMINATION OF THIS AGREEMENT, OR (ii) BE LIABLE FOR DAMAGES OR ALLEGED DAMAGES HEREUNDER, WHETHER IN CONTRACT, TORT, OR ANY OTHER LEGAL THEORY, THAT EXCEED THE AMOUNTS REQUIRED TO BE PAID BY EITHER PARTY TO THE OTHER HEREUNDER. THE PARTIES FURTHER AGREE THAT FOR AMOUNTS PAYABLE UNDER SECTION 7 (INDEMNIFICATION) OR SECTION 8 (CONFIDENTIALITY) HEREUNDER, EITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE SUM OF

($150,000.00). THE FOREGOING NOTWITHSTANDING, AS BETWEEN THE PARTIES AND ANY PARTNER AND/OR VENDOR OF THE RESPECTIVE PARTIES, NOTHING IN THIS AGREEMENT SHALL CONFER ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL, PUNITIVE OR OTHER INDIRECT DAMAGES OF ANY NATURE FOR ANY REASON BY THE PARTIES AGAINST SUCH PARTNER AND/OR VENDOR USED BY THE PARTIES TO PROVIDE AND/OR SUPPORT THE PARTY'S RESPECTIVE PRODUCTS AND/OR SERVICES.

9.    PUBLICITY. The Parties will cooperate to create appropriate public and municipal announcements or press releases relating to the relationship set forth in this Agreement. All public announcements by one Party which mention the other Party, but specifically excluding announcements which mention one Party as a customer or use of marketer or the other Party, shall be subject to prior review and approval, which shall not be unreasonably withheld or delayed.

10.    MISCELLANEOUS.

    a.    Notices. All notices that either Party is required to give, deliver to or on behalf to the other Party shall be in writing and addressed to the first Party, to be served by U.S. registered or certified mail, return receipt, and shall be served via U.S. Parties shall pay the same amount, served with sufficient receipt, and shall be effective upon the date of its receipt. If delivery is made to the Parties in the diligent return of its dispatch address, or otherwise be paid to each such other address.

    b.    Entire Agreement. This Agreement constitutes the entire understanding and agreement between the parties with respect to the subject matter or termination and supersedes any and all prior or contemporaneous oral or written representation, understanding, agreement or communication between the parties concerning the subject matter hereof. Neither Party is relying on any covenant or representation, conditions, assurance or commitment not expressly set forth herein.

    c.    Waiver. No waiver of any provision of this Agreement or any right or obligation or failure of any Party hereunder shall be effective, except pursuant to a written instrument signed by the party or party so being constituted, and any such waiver shall be effective only in the specific instance and for the specific purpose stated therein.

    d.    Force Majeure. Neither Party shall be deemed in default hereunder, nor shall it hold the other Party responsible for any cessation, interruption or delay in the performance of its obligations hereunder due to earthquake, flood, fire, storm, natural disaster, act of God, war, armed conflict, labor strike, lockout, or boycott, provided that the party relying upon this section (i) shall have given the other party prompt written notice thereof and, in any event, within five (5) days of discovery thereof and (ii) shall take all steps reasonably necessary under the circumstances to mitigate the effects of the force majeure event upon which such notice is based, provided further that in the event a force majeure as described in this section exists for a period in excess of thirty

(30) days in the ... to either Party to ... immediately terminate this Agreement.

**Headings.** The section and paragraph headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, govern, limit, modify or construe the scope or extent of the provisions of this Agreement to which they may relate. Such headings are not part of this Agreement and shall not be given any legal effect.

**Amendments and Severability.** No amendment or modification of this Agreement, including waiver of any right, will be effective unless set forth in a writing by the party to be charged, and the waiver of any breach or default will not constitute a waiver of any other right hereunder or any subsequent breach or default. If the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement in any way will ... affected or impaired thereby.

**Assignment.** This Agreement shall be binding upon and inure to the benefit of each party's successors and assigns. Neither Party may assign this Agreement, in whole or in part, without the other Party's prior written consent; provided, however, that the sale of any portion of the assets of either Party, or any other transfer or acquisition by merger, consolidation or similar ... shall not be deemed an assignment of this Agreement by such party. Each ... hereby shall be the duty to give notice of any required assignment within a reasonable ... must prevail, written notice to the other Party, from ... the consummation of the respective (30) calendar day ... of its closing. Any attempt to assign ... agreement ... not in accordance with this section shall be null and void.

**Independent Contractor.** The Parties to this Agreement are independent contractors. Neither Party shall be an agent, representative, or partner of the other party. Neither Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability of, or to otherwise bind the other Party. This Agreement shall not be interpreted or construed to create an association, joint venture, partnership, principal-agent, or to impose any partnership obligation or liability upon either party, nor shall either party have any right, power or authority to create any obligation or responsibility on behalf of the other. ... nor in entering into this Agreement.

**Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, without reference to conflicts of law or choice of law rules. All legal action relating to this Agreement shall be brought in the state or federal courts located in the State of Nevada.

**Non-Exclusive Arrangement.** The Parties understand that this Agreement is not an exclusive arrangement between the Parties. The Parties agree that they are free to enter into similar transactions as set forth in this Agreement with other entities and that the Parties may directly or indirectly ... their customers referrals or other business, and ...

terms that may differ from the terms and conditions set forth herein.

Construction. In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed, or if any provision is held invalid by a court of competent jurisdiction, such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties, and the remainder of this Agreement shall remain in full force and effect. There shall be no presumption for or against either Party, a party of such Party being the principal drafter of this Agreement.

IN WITNESS WHEREOF, each of Noble Wealth Systems, LLC DBA IACCP and Noble Learning Systems, Inc. has caused this Agreement to be executed and delivered by its duly authorized representative.

Noble Wealth Systems, LLC DBA IACCP            Noble Learning Systems, Inc.

By (Sign) _____              By (Sign) _____
Name: _____                 Name: Heather Rizzo
Title: Managing Member                         Title: Chief Financial Officer
Date: _____                  Date: _____

## APPENDIX A: Party Responsibilities & Payment Terms

Noble Wealth Systems, LLC DBA IACCP and Noble Learning Systems, Inc. have agreed to execute the marketing activities identified below. Each party will coordinate their respective marketing activities. All such promotional and marketing costs by a respective party shall be borne solely by that party, unless otherwise indicated below.

### Activities of Noble Wealth Systems, LLC DBA IACCP
Will actively and continually promote Noble Learning's certificate courses and publications to members in order to fulfill their Associating Community education requirements.

### Activities of Noble Learning Systems, Inc.
Will produce, in production and fulfillment of all continuing education materials. Will acknowledge Certificates using IACCP as a recognized professional trade association authority.

### Payment Terms
Payment amount will be USD 1,000.00 invoiced yearly to IACCP in promotion of Noble Learning material. Any additional payments or permissions requires written authorization of Noble Learning.